PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2365
_____

TRI-M GROUP, LLC

v.

THOMAS B. SHARP,
Secretary, Delaware Department of Labor,
Appellant
_____

Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 1-06-cv-00556)
District Judge: Honorable Sue L. Robinson
_____

Argued December 15, 2010

Before: RENDELL, HARDIMAN and VANASKIE,
Circuit Judges.

(Opinion Filed: March 21, 2011)
_____

Linda M. Carmichael, Esq.
Jennifer D. Oliva, Esq.    **[ARGUED]**
Department of Justice
Room 627
820 North French Street
Carvel Office Building, 6th Floor
Wilmington, DE  19801
   *Counsel for Appellant*

Alexander G. Bomstein, Esq.
Stephen J. Sundheim, Esq.    **[ARGUED]**
Justin J. Williams, Esq.
Pepper Hamilton
18th & Arch Streets
3000Two Logan Square
Philadelphia, PA  19103

M. Duncan Grant, Esq.
Pepper Hamilton
1313 Market Street
Suite 5100, P.O. Box 1709
Wilmington, DE  19899
   *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

RENDELL, <u>Circuit Judge</u>.

In this appeal, we confront Tri-M Group, LLC's ("Tri-M") challenge to the constitutionality of Delaware's regulatory scheme for the training and compensation of

apprentices on construction projects. In the District Court, Tri-M sought a declaratory judgment and injunctive relief against enforcement of the Delaware Prevailing Wage Regulations ("DPWR"), 19-1000-1322 DEL. ADMIN. CODE § 1 *et seq.* (2010), and the Rules and Regulations Relating to Delaware Apprenticeship and Training Law ("ATRR"), 19-1000-1101 DEL. ADMIN. CODE § 1.0 *et seq.* (2010), alleging that the regulations discriminated against Tri-M and other out-of-state contractors in violation of the negative – or dormant – Commerce Clause. The District Court granted summary judgment to Tri-M, concluding that Delaware's refusal to recognize out-of-state registered apprentices facially discriminated against out-of-state contractors without advancing a legitimate state interest, and this appeal followed. *See Tri-M Group, LLC v. Sharp*, 705 F. Supp. 2d 335 (D. Del. 2010). We agree and will affirm.

<u>Background & Procedural History</u>

The facts of the underlying suit are undisputed. In response to passage of the National Apprentice Act ("Fitzgerald Act"), 29 U.S.C. § 50 *et seq.*, Delaware enacted an apprentice regulatory scheme to "develop and conduct employee training and registered apprenticeship programs," and to provide "for the establishment and furtherance of standards of apprenticeship and training to safeguard the welfare of apprentices and trainees." 19 DEL. C. § 201.[1] The

---

[1] Pursuant to the implementing regulations, a federal Bureau of Apprenticeship and Training may delegate authority to state apprenticeship agencies to register and supervise apprenticeship programs within the state, and may promulgate apprenticeship laws and regulations pertaining to

3

Delaware Prevailing Wage Law ("PWL"), 29 DEL. C. § 6960 *et seq.*,[2] provides that, for certain public works projects at least partially funded by the State, mechanics and laborers – including apprentices – shall be paid a prevailing wage set by the Delaware Department of Labor ("DDOL").[3] The implementing Delaware Prevailing Wage Regulations ("DPWR") define mechanics and laborers as "those workers

_____

the registration of apprenticeship programs. *See* 29 C.F.R. § 29.

[2] The PWL states:

> The specifications for every contract or aggregate of contracts relating to a public works project in excess of $100,000 for new construction . . . or $15,000 for alteration, repair, renovation, rehabilitation, demolition or reconstruction . . . to which this State or any subdivision thereof is a party and for which the State appropriated any part of the funds and which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Delaware Department of Labor, to be prevailing in the county in which the work is to be performed.

29 DEL. C. § 6960(a).

[3] DDOL is charged with administering and enforcing the Delaware Prevailing Wage Law. *See* 19 DEL. C. § 105(a)(1).

whose duties are manual or physical in nature, as distinguished from mental or managerial." 19-1000-1322 DEL. ADMIN. CODE § 3.1.3. Although apprentices are included within the definition of a mechanic, the regulations distinguish between the two, and define apprentices as "persons who are indentured and employed in a bona fide apprenticeship program and individually registered by the program sponsor with the [DDOL]." *Id.* §§ 3.1.3 & 3.1.4.1.1. The regulations further provide a detailed schedule of the "minimum wage progression" for registered apprentices, and establish that employers must pay apprentices a fraction of the wages earned by mechanics.[4] 19-1000-1101 DEL. ADMIN. CODE §§ 6.2.6 & 6.2.7. The apprentice rate depends on the length of the project and the apprentice's progression, but is always a percentage of the mechanic's rate.[5]

Pursuant to the regulations, only a contractor that has registered its apprenticeship program in Delaware is eligible

---

[4] The terms "mechanic" and "journeyman" are used interchangeably in the Delaware laws and regulations. For consistency, we utilize the term "mechanic" throughout this opinion.

[5] The applicable regulation provides that in a 2000-hour apprenticeship program, the minimum apprentice rate is 40% of the mechanic's rate for the first 1,000 hours, and 85% for the second 1,000 hours. In an 8,000-hour program, the minimum apprentice rate is 40% for the first 1,000 hours, and increases at 1,000-hour increments thereafter, with the final period corresponding to 85% of the mechanic's rate. 19-1000-1101 DEL. ADMIN. CODE. § 6.2.7.

5

to pay the lower apprentice wage rate to registered apprentices. To qualify, a contractor

> must be a "Delaware Resident Contractor" or hold and maintain a "Delaware Resident Business License." The Registrant or Sponsor must hold and maintain a permanent place of business, not to include site trailers or other facilities serving only one contract or related set of contracts. To be eligible to be a Registrant or Sponsor, Employer/Business . . . must have the training program and an adequate number of Journeypersons to meet the ratio requirements as stated for that particular apprenticeable occupation.

19-1000-1101 DEL. ADMIN. CODE § 3.1.[6] Under this rubric, an out-of-state contractor cannot sponsor an apprentice program without setting up and maintaining a permanent office location within Delaware.[7] Failure to abide by these conditions may result in financial penalties and bar an

---

[6] A "Delaware Resident Contractor" "includes any general contractor . . . [or] subcontractor . . . who regularly maintains a place of business in Delaware. Regularly maintaining a place of business in Delaware does not include site trailers, temporary structures associated with one contract or set of related contracts. . . ." 19-1000-1101 DEL. ADMIN. CODE § 3.1

[7] Prior to 1999, the pertinent Delaware regulations did not include a permanent place of business requirement, and Tri-M was a Delaware-registered sponsor with all of the benefits pertaining thereto.

employer judicially determined to have violated the PWL from bidding on public construction contracts for three years. *See* 29 DEL. C. § 6960(e). In this way, the Delaware regulations permit in-state contractors on public works projects to pay a reduced apprentice rate to their Delaware-registered apprentices, while requiring out-of-state contractors to pay the higher mechanic's rate to their non-Delaware-registered apprentices.[8]

Appellee Tri-M is a Pennsylvania-based electrical contracting company that successfully bid on a sub-contract for electrical and building automation work at the Delaware State Veterans Home ("the Project") in Milford, Delaware, which was funded in part by Delaware state funds.[9] Tri-M began work on the Project in August 2005, employing Pennsylvania-registered apprentices and fully-trained mechanic professionals, but paid its employees pursuant to the wage rates described in the DDOL prevailing wage determination for their respective classifications.

---

[8] The prevailing wage rate schedules periodically published by DDOL explicitly state that "non-registered apprentices must be paid the mechanic's rate." (*See* Appellant's Opening Br. at 9; App'x at 366.)

[9] Tri-M maintains an apprenticeship program that is registered with the Pennsylvania Apprenticeship and Training Council of the Pennsylvania Department of Labor and Industry ("PATC"), and its apprentice electricians are Pennsylvania-registered apprentices, individually registered with PATC pursuant to individual apprenticeship agreements.

7

On March 26, 2009, a DDOL Labor Law Enforcement Officer conducted an on-site inspection of the Project site. The officer subsequently informed Tri-M that the DDOL had opened a case to verify Tri-M's compliance with the PWL, and requested and timely received Tri-M's daily logs and sworn payroll reports for employees working on the Project. He also confirmed with the Delaware Apprenticeship and Training Department that Tri-M did not have an apprentice program registered in Delaware. This necessarily meant that Tri-M's apprentices were not Delaware-registered apprentices. Tri-M's CFO inquired about registering Tri-M's apprentices in Delaware, but was informed that Delaware requires an apprentice program sponsor to maintain a permanent place of business in Delaware.[10]

Tri-M's records indicated that it paid its Pennsylvania-registered apprentices the Delaware-registered apprentice rate, rather than the mechanic's rate applicable to non-Delaware-registered apprentices. As a result, DDOL informed Tri-M that it was in violation of the PWL and DPWR for failing to pay the applicable higher prevailing wage rates. Tri-M was thus required to conduct a self-audit and pay any wage deficiencies to the Pennsylvania-registered apprentices who incorrectly received the lower apprentice rate, instead of the higher mechanic's rate. Tri-M provided DDOL with documentation regarding its self-audit, including the amounts needed to bring each employee's pay up to the mechanic's prevailing wage rate, and timely reimbursed the

---

[10] Although Tri-M worked and maintained a site trailer in Delaware for many years at the AstraZeneca facility in Wilmington, this presence did not satisfy the residency requirement. *See* 19-1000-1101 DEL. ADMIN. CODE § 3.1.

six Pennsylvania-registered apprentices working on the Project who were not recognized as apprentices under Delaware law.[11]

Subsequently, Tri-M brought an action for declaratory and injunctive relief against then-Secretary of the Delaware Department of Labor Thomas Sharp, alleging that DDOL discriminated against Tri-M and other out-of-state contractors by refusing to recognize their out-of-state registered apprentices for purposes of the PWL and DPWR. At the conclusion of discovery, the District Court granted summary judgment to Tri-M, and this appeal followed.

DDOL raises three primary arguments on appeal. First, DDOL contends that the State's challenged procurement scheme – including the permanent place of business requirement – does not discriminate against interstate commerce, and is, therefore, not violative of the dormant Commerce Clause. Second, DDOL posits that the contested apprentice program regulations were explicitly authorized by Congress and approved by the United States Department of Labor, thus negating any conflict with the Commerce Clause. Finally, DDOL argues, for the first time on appeal, that even assuming *arguendo* that the challenged regulatory scheme is discriminatory, its attachment of prevailing wage conditions to State-funded public works contracts constitutes participation in the private market and does not run afoul of the dormant Commerce Clause.

---

[11] The DDOL ultimately determined that although Tri-M had initially violated the PWL and DPWR, the subsequent reimbursement brought Tri-M into compliance with the rules.

## Jurisdiction and Standard of Review

The District Court exercised federal subject matter jurisdiction over Tri-M's complaint pursuant to 28 U.S.C. §1331. Our jurisdiction arises under 28 U.S.C. § 1291 over the State's appeal of the District Court's grant of summary judgment to Tri-M. We exercise plenary review of a district court's order granting or denying summary judgment, applying the same standard as the district court: "Summary Judgment is appropriate only where, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007) (internal quotation and citation omitted).

## Discussion

We are asked to decide whether Delaware's differentiated prevailing wage regulations interfere with interstate commerce in violation of the Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3. We cannot reach this question, however, without first resolving DDOL's contention that the imposition of prevailing wage conditions upon out-of-state contractors constituted permissible market participation by the State within the bounds of the dormant Commerce Clause. This is so because "courts treat the question of whether the state is acting as a market participant as a threshold question for dormant Commerce Clause analysis." *United Healthcare Ins. Co. v. Davis*, 602 F.3d 618, 624 (5th Cir. 2010) (citing *White v. Mass. Council of Const. Employ., Inc.*, 460 U.S. 204, 210 (1983)). "Impact on out-of-state residents figures in the equation *only after* it is decided

10

that the city is regulating the market rather than participating in it, for only in the former case need it be determined whether any burden on interstate commerce is permitted by the Commerce Clause." *White*, 460 U.S. at 210 (emphasis added); *see also Brooks v. Vassar*, 462 F.3d 341, 355 (4th Cir. 2006) ("Before applying the dormant Commerce Clause to State activities that burden or discriminate against interstate commerce, a court must determine whether the State is acting as a market *participant*, rather than as a market *regulator*.") (citation and internal quotations omitted; emphasis in original); *J.F. Shea Co., Inc. v. City of Chicago*, 992 F.2d 745, 748 (7th Cir. 1993) ("The impact of the local business preference on out-of-state residents figures into the analysis only *after* it is decided that the City is regulating the market rather than participating in it," and appellant cannot "jump[ ] to the second aspect of dormant commerce clause analysis without clearing the first hurdle") (emphasis in original). Accordingly, we would customarily assess whether the market participant exception applies to Delaware's regulatory scheme *before* deciding if the allegedly discriminatory rules improperly burden interstate commerce. *See generally Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. Cnty.*, 48 F.3d 701, 717 (3d Cir. 1995) (examining burden on interstate commerce after finding that city rules were promulgated "in its role as a market regulator" and are "not immune from review under the Commerce Clause").

In deciding this threshold question, however, we must first confront a preliminary issue, namely, whether DDOL can avail itself of the market participant exception, having failed to argue to the District Court that the exception should

11

apply.[12] It is axiomatic that "'arguments asserted for the first time on appeal are deemed to be waived and consequently are not susceptible to review in this Court absent exceptional circumstances.'" *United States v. Petersen*, 622 F.3d 196, 202 n.4 (3d Cir. 2010) (quoting *United States v. Rose*, 538 F.3d 175, 179 (3d Cir. 2008)). "This general rule serves several important judicial interests, protect[ing] litigants from unfair surprise; promot[ing] the finality of judgments and conserv[ing] judicial resources; and preventing district courts from being reversed on grounds that were never urged or argued before [them]." *Webb v. City of Philadelphia*, 562 F.3d 256, 263 (3d Cir. 2009) (internal citations and quotations omitted; alterations in original).

Nonetheless, we will still address arguments raised for the first time on appeal in "exceptional circumstances," and note that "'the matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.'" *Council of Alter. Pol. Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999) (quoting *Singleton v. Wulff*, 428 U.S. 106, 121 (1976)); *see also Selected Risks Ins. Co. v. Bruno*, 718 F.2d 67, 69 (3d Cir. 1983) (noting that waiver rule "is one of discretion rather than jurisdiction"). Indeed, the waiver principle "is only a rule of practice and may be relaxed whenever the public interest or justice so warrants." *Franki Found. Co. v. Alger-Rau & Assoc., Inc.*,

---

[12] Before the District Court, DDOL urged that Congress had explicitly authorized the contested apprentice regulations, and, presumably, contemplated that no real dormant Commerce Clause issue actually existed. The District Court did not accept this argument.

513 F.2d 581, 586 (3d Cir. 1975); *See also Barefoot Architect, Inc. v. Bunge*, -- F.3d --, 2011 WL 121698, at *10 (3d Cir. Jan. 14, 2011) (same); *Rogers v. Larson*, 563 F.2d 617, 620 n.4 (3d Cir. 1977) (same).[13]

We think the "public interest" weighs heavily toward our consideration of the market participant issue. Specifically, the District Court's decision calls into doubt the constitutionality of the Delaware regulatory scheme, as well as the public works procurement laws of approximately 37 other states.[14] The market participant doctrine impacts the labor and wage conditions attendant to every public works contract in Delaware, and invites legal challenges to the procurement schemes of every similarly-situated state. As DDOL suggests, this legal dispute entails crucial and unresolved issues of state sovereignty and state procurement

---

[13] *See also United States v. Anthony Dell'Aquilla, Enters. & Subsidiaries*, 150 F.3d 329, 335 (3d Cir. 1998) (noting that new issues raised on appeal may warrant review "when the public interest requires that the issue be heard or when manifest injustice would result from the failure to consider the new issue[s]") (citation and quotations omitted; alteration in original).

[14] We respectfully disagree with our concurring colleague's characterization of this appeal as merely involving "$10,000 in wages Tri-M paid to six apprentices who worked on a [completed] state-sponsored construction project." Con. Op. at 1.

13

spending, and tests the limits of the dormant Commerce Clause in this field.[15]

Moreover, the nature of the precise issue raised fits within the category of "exceptional circumstances" warranting our consideration. As we noted above, in our dormant Commerce Clause jurisprudence, the alleged burden on interstate commerce is generally evaluated "only after" it is decided that a state is regulating, rather than participating, in a market. *White*, 460 U.S. at 210. The market participant determination is a "threshold question for dormant Commerce Clause analysis," *Davis*, 602 F.3d at 624, because "the strictures of the dormant Commerce Clause are not activated unless a state action may be characterized as a 'regulation,'" *SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 510 (2d Cir. 1995). Accordingly, a court should not turn a blind eye to the fact that a state cannot be held to have improperly discriminated against interstate commerce – as was found in

---

[15] Most recently, we found the fact that "we have not yet addressed the issue raised" to itself constitute "an *institutional consideration* that can be viewed as 'an exceptional circumstance'" under the "public interest" prong of the analysis. *United States v. Petersen*, 622 F.3d 196, 202 n.4 (3d Cir. 2010) (reviewing a rare procedural posture whereby a jury charge was offered by the trial court, but refused by the defendant) (emphasis added). Despite the importance and novelty of the issues implicated by the market participant doctrine, our last decision in the field was issued in 1995. Under *Petersen*, this itself constitutes an "institutional consideration" warranting timely review.

14

this case – if it was behaving as a market participant, rather than a market regulator.

We have previously stated that an argument omitted before the district court may nevertheless be considered where it "is closely related to arguments that [the parties] did raise in that court." *Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005). Most recently, we declined to apply the waiver rule formalistically where a party neglected to adequately press a claim under Restatement (Second) of Torts § 766A before the district court, having urged instead an unsuccessful argument based on the related § 766.[16] *Bunge*, -- F.3d --, 2011 WL 121698, at \*10. Noting the interrelated nature of the separate sections, we excused the defendant's invocation of "the wrong definition of the tort," and decided the § 766A issue. *Id.* Similarly here, we cannot conclude that the intertwined market participant aspect of the dormant Commerce Clause analysis was waived in a manner that precludes us from ascertaining whether the regulations at issue constitute permissible market participation or unconstitutional discrimination.

Moreover, as in *Bunge*, from a public policy standpoint, we think "[t]he public interest is better served by

---

[16] Both sections address the tort of intentional interference with another's performance of a contract, but § 766A lacks as an element the requirement of a failure to perform; as a result, § 776A favored the appellant in *Bunge*, whereas § 766 did not. 2011 WL 121698, at \*9. We relaxed the waiver rule and found the new argument under § 766A determinative to the resolution of the issue in appellant's favor requiring reversal, unlike here, where we are affirming the District Court.

addressing [this issue] than by ignoring it." *Id.* In its most recent decision concerning the dormant Commerce Clause, the Supreme Court observed that it granted certiorari to address a legal decision that "cast[ ] constitutional doubt on a tax regime adopted by a majority of the States," finding the matter "raised [ ] an important question of constitutional law." *Dep't of Rev. v. Davis*, 553 U.S. 328, 337 (2008). Similarly, the instant appeal "casts constitutional doubt" upon a state procurement scheme "adopted by a majority of the States," and presents a weighty question of public concern.

Furthermore, application of waiver is not compelled by the primary prudential aims of the waiver rule. "The waiver rule applies with greatest force 'where the timely raising of the issue would have permitted the parties to develop a factual record.'" *Id.* (citation omitted). Accordingly, "we have been reluctant to apply the waiver doctrine when only an issue of law is raised" and no additional fact-finding is necessary. *Huber v. Taylor*, 469 F.3d 67, 74 (3d Cir. 2006); *see also Hooks*, 179 F.3d at 69 (exercising discretion to address a new argument where the "issue involved . . . concerns a pure question of law, and in the interest of avoiding further delay"). "The waiver rule serves two purposes: ensuring that the necessary evidentiary development occurs in the trial court, and preventing surprise to the parties when a case is decided on some basis on which they have not presented argument." *Bunge*, -- F.3d --, 2011 WL 121698, at *10.

Neither party disputes the District Court's factual findings, nor does either party suggest that further development of the record at the District Court level would assist resolution of this matter. Therefore, we are confronted

16

solely with a pure question of law as to the applicability of the market participant exception.[17] *See Huber*, 469 F.3d at 75 ("[W]e are less inclined to find a waiver when the parties have had the opportunity to offer all the relevant evidence."). Furthermore, the litigants were afforded ample opportunity to present and develop their legal theories and arguments on the issue, obviating any plausible claim of unfair surprise or prejudice.[18]

Finally, the judicial interests highlighted by *Webb* as further justification for the general waiver principle are not undermined by our decision to consider the market participant exception here. *See supra*. Specifically, by resolving this purely legal question without further unnecessary proceedings before the district court, we will "conserve judicial resources." Additionally, because we adopt the District Court's dormant Commerce Clause analysis, and are not basing our decision on the market participant exception as such, we are not ruling "on grounds that were never urged or argued." *Id.*

---

[17] In the dormant Commerce Clause context specifically, we previously declined a request to remand a government agency's new arguments to the district court because "the facts [were] not in dispute" and the "public interest [was] sufficiently implicated [ ] to require resolution" of the new issues. *Appalachian States Low-Level Radioactive Waste Com'n v. Pena*, 126 F.3d 193, 196 (3d Cir. 1997).

[18] Notably, Tri-M does not actually assert in its briefing that our resolution of the market participant question would be prejudicial or unfair.

At bottom, because the parties have fully developed their arguments on appeal and this aspect of the dormant Commerce Clause challenge before us sufficiently implicates the public interest, it is appropriate for us to resolve whether the market participant exception applies.

## I. Market Participant Exception

Accordingly, we will first address DDOL's claim that in regulating the prevailing wages and imposing the permanent place of business requirement, Delaware acted as a mere participant in the market.

## A.

The Commerce Clause of the United States Constitution grants Congress plenary authority to regulate commerce among the states, and "has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of Or.*, 511 U.S. 93, 98 (1994). Where a state restriction discriminates against interstate commerce by providing "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," it is virtually *per se* invalid in all but the narrowest circumstances. *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Oregon Waste*, 511 U.S. at 99). Pursuant to negative or dormant Commerce Clause jurisprudence, a discriminatory state law "will survive only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Davis*, 553 U.S. at 338 (quoting *Oregon Waste*, 511 U.S. at 101).

"Some cases run a different course, however, and an exception covers States that go beyond regulation and themselves 'participat[e] in the market.'" *Id.* at 339 (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 810 (1976)) (alterations in original). "Nothing in the purposes animating the Commerce Clause prohibits a State, in the absence of congressional action, from participating in the market and exercising the right to favor its own citizens over others." *Alexandria Scrap*, 426 U.S. at 810; *see also Atl. Coast*, 48 F.3d at 715 (recognizing "exception from the restraints of the dormant Commerce Clause for otherwise discriminatory action taken by a governmental entity in its role as a market participant"). Therefore, "when a state or local government enters the market as a participant it is not subject to the restraints of the Commerce Clause," and our "single inquiry" is limited to ascertaining "'whether the challenged program constituted direct state participation in the market.'" *White*, 460 U.S. at 208 (quoting *Alexandria Scrap*, 426 U.S. at 436 n.7).[19]

In practice, the Supreme Court has found a state or municipality to act as a market participant where "the government was participating directly in some aspect of the market as a purchaser, seller, or producer, and the alleged

_____

[19] The Court further emphasized that since "state proprietary activities may be, and often are, burdened with the same restrictions imposed on private market participants," "[e]venhandedness suggests that, when acting as proprietors, States should similarly share existing freedoms from federal constraints, including the inherent limits of the Commerce Clause." *White*, 460 U.S. at 207 n.3.

19

discriminatory effects on the interstate market flowed from these market actions." *Atl. Coast*, 48 F.3d at 716. The exception was initially described in *Alexandria Scrap*. 426 U.S. at 797. There, the Supreme Court upheld a Maryland statute that, in an effort to remove abandoned automobiles from the State's roads, promised a cash "bounty" to scrap processors licensed by the state for the destruction of any vehicle previously titled in Maryland, while denying a similar payment to out-of-state processors. *Id.* at 797, 801. The Court found that Maryland had "entered into the market itself to bid up the[ ] price . . . as a purchaser," and was a market participant behaving as a private actor. *Id.* at 809. Several years later, the Court reaffirmed the distinction between market participant and market regulator in *Reeves, Inc. v. Stake*, sustaining South Dakota's decision to confine sales of cement by a state-owned and -operated cement plant to state residents during a cement shortage. 447 U.S. 429, 431-32, 438 (1980) (emphasizing that a state conducting business as a private actor may "exercise [its] own independent discretion as to parties with whom [it] will deal," and may preference in-state interests.)

Similarly, in *White*, the Supreme Court again applied the market participant exception in upholding a mayor's executive order that required every construction project funded in part by city funds to be performed by a work force of at least 50% city residents. 460 U.S. at 205, 208. The Court observed that the city participated in the market by "expend[ing] its own funds in entering into construction contracts for public projects," but cautioned that "some limits on a state or local government's ability to impose restrictions that reach beyond the immediate parties with which the government transacts business" must exist. *Id.* at 211. The

20

Court declined to define those limits, however, because "everyone affected by the order [was], in a substantial if informal sense, working for the city.'" *Id.* at 214-15 (internal citations omitted).[20]

Our own jurisprudence reflects limited opportunity to opine regarding the exception. In *Swin Resources Systems, Inc. v. Lycoming County, Pa.*, we upheld a county's decision to charge a preferential rate for reception and disposal of waste generated within the county as compared to waste generated outside the vicinity. 883 F.2d 245, 246 (3d Cir. 1989). Analogizing to *Alexandria Scrap*, *Reeves*, and *White*, we noted that the pricing scheme did not affect prices outside the direct transactions and reflected permissible restrictions by a market participant upon those it dealt with directly in the marketplace. *Id.* The subsequent year, in *Trojan Technologies v. Pennsylvania*, we approved a State procurement law that required all political subdivisions to purchase only American-made steel products. 916 F.2d 903, 904-05 (3d Cir. 1990). We noted that, "[a]s the ultimately controlling public purchaser, the Commonwealth enjoys the same right to specify to its suppliers the source of steel to be

---

[20] The Supreme Court declined to extend the doctrine, however, in *South-Central Timber Development, Inc. v. Wunnicke*, finding that an Alaska statute conditioning the sale of state timber to private purchasers upon agreement to process the timber within the State represented impermissible "downstream regulation." 467 U.S. 82, 98-99. The Court observed that "although the State may be a participant in the timber market, it is using its leverage in that market to exert a regulatory effect in the processing market, in which it is not a participant." *Id.*

21

used in any supplies provided as is enjoyed by similarly situated private purchasers." *Id.*

We declined to apply the market participant exception, however, to a state law that permitted state agencies to establish solid waste districts that controlled the flow of all waste within the district to designated disposal facilities within and outside the district and state. *Atl. Coast*, 48 F.3d at 706-07. We determined that the disposal site designation criteria extended beyond private participation, and, in fact, controlled the conduct of private parties in the market:

> When a public entity participates in a market, it may sell and buy what it chooses, to or from whom it chooses, on terms of its choice; its market participation does not, however, confer upon it the right to use its regulatory power to control the actions of others in that market.

*Id.* at 717. Because the regulations did not "merely determine the manner or conditions under which the government will provide a service, [and] require[d] all participants in the market to purchase the government service," the state's conduct did not fall within the market participant exception.[21]

---

[21] Several of our fellow Courts of Appeals have likewise found the market participant exception inapplicable in comparable instances where a municipality's participation in a market effected concurrent regulation of private parties in that market. *See, e.g. Waste Mgmt. Holdgs., Inc. v. Gilmore*, 252 F.3d 316, 345 (4th Cir. 2001) (finding that Virginia "was not acting as a private participant in the waste disposal market" by regulating the conduct of others in that market)

*Id.*; *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 438 F.3d 150, 158 (2d Cir. 2006) ("[I]t is well settled that a state may act as a market participant with respect to one portion of a program while operating as a market regulator in implementing another.") (citing *USA Recycling*, 66 F.3d at 1283).

More recently, we had occasion to consider the "regulator/market-participant distinction" in the context of federal preemption under the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, where a municipality conditioned financing upon the borrower's agreement to a labor neutrality agreement. *Hotel Empls. & Rest. Empls. Union, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, 215 (3d Cir. 2004).[22] There, we observed that "whether a

(citation omitted); *USA Recycling, Inc. v. Town of Babylon*, 66 F.3d 1272, 1282 (2d Cir. 1995) ("[S]tates and local governments do not enjoy *carte blanche* to regulate a market simply because they also participate in that market.").

[22] Although this line of cases involves preemption analysis under the NLRA and other federal statutes, the Supreme Court's discussion of the market participant exception in this context relies upon and conforms with its dormant Commerce Clause jurisprudence, and is instructive. *See, e.g.*, *Engine Mfrs. Ass'n v. So. Coast Air Quality Mgmt. Dist.*, 498 F.3d 1031, 1040 (9th Cir. 2007) ("After the development of the market participant doctrine in [ ] dormant Commerce Clause cases, the Supreme Court . . . [has] applied the doctrine to protect proprietary state action from preemption by various federal statutes."); *Cardinal Towing & Auto Repair, Inc. v. City of Bedford, Tx.*, 180 F.3d 686, 691 (5th Cir. 1999)

government's condition of funding constitutes market participation . . . depends upon the following two step test: First, does the challenged funding condition serve to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier? Second, is the scope of the funding condition 'specifically tailored' to the proprietary interest?" *Id.* at 215-16 (citing *Bldg. & Constr. Trades Council v. Assoc. Builders & Contr. of Mass./R.I., Inc. ("Boston Harbor")*, 507 U.S. 218, 232 (1993)).[23] We emphasized that the "mere fact that

---

(noting that the market participant exception originating in dormant Commerce Clause analysis "has been recognized in preemption cases"); *Metro. Taxicab Bd. of Trade v. City of New York*, No. 08 Civ. 7837, 2008 WL 4866021, at *7 (S.D.N.Y. Oct. 31, 2008) ("The market participant doctrine is an extension of a principle from the Commerce Clause . . . and has been extended to preemption jurisprudence") (citing *Alexandria Scrap*, 426 U.S. at 810).

[23] In *Boston Harbor*, the Supreme Court found that the NLRA did not preempt a bid specification by a Massachusetts agency requiring bidders to abide by a certain labor agreement because the government was acting as a market participant, rather than regulating labor-management relations. 507 U.S. at 229 (explaining that preemption doctrines apply only to state regulation). The Court emphasized that the cleanup project targeted by the relevant specification constituted market participation since it was "specifically tailored to one particular job" to ensure "an efficient project that would be completed as quickly and effectively as possible at the lowest cost." *Id.* In effect, the state was acting "with no interest in setting policy." *Id.*

government affects labor relations by imposing conditions under its power to procure or to spend does not automatically mean that the state is acting in a propriety capacity" as a market participant. *Id.* at 213. Finding that the city's insistence upon a no-strike agreement did not "sweep[ ] more broadly than [ ] a government agency's proprietary economic interest," we concluded that the funding condition was "specifically tailored to protect its proprietary interest in the value" of the implicated property, and was narrowly tailored only to projects receiving the funds. *Id.* at 217-18.

Notably, this reasoning squares with the Supreme Court's most recent pronouncement in the field. In *Chamber of Commerce of the U.S.A. v. Brown*, the Supreme Court declined to find market participation in the preemption context where a California statute imposing a targeted negative restriction on employer speech was neither "'specifically tailored to one particular job,' nor a 'legitimate response to state procurement constraints or to local economic needs.'" 554 U.S. 60, 70 (2008) (quoting *Wisc. Dep't of Ind., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282, 291 (1986)). Where the "legislative purpose is not the efficient procurement of goods and services, but the furtherance of a labor policy," a state actor is behaving "in its capacity as a regulator rather than a market participant." *Id.*

**B.**

From the foregoing, we can glean several questions a court should ask when conducting the "single inquiry" of determining "whether the challenged program constitute[s] direct state participation in the market," or market regulation. *White*, 460 U.S. at 208. Is the regulation limited to a job or

25

contract in which a governmental entity is engaged? Is the action designed merely to protect or advance a specific proprietary interest? Is it tailored to that interest? Does the government's involvement affect only those with whom the entity is dealing in the market, or does it impact others or set broad policies? In reaching the answer, the Court "must consider in each specific context if the government is acting like a private business or a governmental entity."[24] *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 93 (2d Cir. 2009).

Here, DDOL urges that Delaware's attachment of its prevailing wage conditions to State-funded public works contracts is analogous to a private party's attaching labor conditions to private market transactions, and that the State's desire to advance policy interests does not preclude the application of the market participant doctrine. Were this an accurate characterization of the state's conduct – *i.e.*, merely attaching conditions to private market transactions – we would agree. But it is not. There is nothing in the regulations that could be deemed tailored or targeted to a specific proprietary interest; the conditions do not attach to a specific job or contract in which the government is engaged. To the contrary, unlike the factual circumstances considered by the Supreme Court in *Alexandria Scrap*, *Reeves*, and *White*, and by our own Court in *Swin* and *Trojan*, the disputed prevailing

---

[24] In this regard, we observed in *Swin* that "application of the distinction between 'market participant' and 'market regulator' has [ ] occasioned considerable dispute in the Supreme Court's jurisprudence," with the "author of each of the three opinions that applied the doctrine [*Hughes*, *White*, and *Reeves*] . . . author[ing] a dissent in the next." 883 F.2d at 249.

26

wage conditions here are part of an expansive regulatory scheme that controls the market activities of private participants; this involvement clearly reflects a governmental interest in setting labor policy, rather than merely impacting the state's own participation in the market.

As an initial matter, the apprenticeship regulations sweep broadly. They are not limited in scope only to contracts in which the state directly participates in a funding or procurement capacity. As DDOL conceded in its briefing and at oral argument, the ATRR do not refer exclusively to public contracts, and they actually regulate Delaware-resident sponsors in the private contractual market for labor. (*See* Appellant's Reply Br. at 22.) Specifically, once a contractor becomes a Delaware-registered apprenticeship program sponsor, it must adhere to the apprentice prevailing wage rates and training requirements regardless of whether the contractor is thereafter performing labor on a public or private contract. (*Id.* at 22-23; Appellant's Opening Br. at 29-30.) In this context, DDOL expressly conceded that it was "regulating apprentice labor (rather than acting as a market participant)." (Appellant's Reply Br. at 22-23.)

This admission followed DDOL's earlier concession before the District Court that DDOL's ability to monitor and inspect apprenticeship program resident sponsors – through on-site visits – and to enforce the apprenticeship wage and training requirements was "not limited to public works projects," and could potentially extend to private projects outside Delaware.[25] (*See* Sharp's Opening Br. in Support of

---

[25] Under this rubric, if, as the Delaware rules currently provide, an out-of-state contractor establishes a permanent place of business and becomes a registered sponsor in order

27

Mot. for Sum. Judg. at 22.) In this regard, "the funding condition [is not] 'specifically tailored' to the proprietary interest," and Delaware is not so much participating in the market as it is regulating the market as a whole. *Hotel Empls.*, 390 F.3d at 215.

In *Wyoming v. Oklahoma*, 502 U.S. 437, 456 (1992), the Supreme Court invalidated a state statute that required all Oklahoma electricity plants to use at least 10% Oklahoma coal. Although the Court acknowledged that the state was participating in the market by purchasing coal for its own plant, the Court found the market participant exception inapplicable because the law also regulated the purchasing behavior of private plants. *Id.*; *see also SSC Corp. v. Town of Smithtown*, 66 F.3d 502, 513 (2d Cir. 1995) (discussing *Wyoming*, and noting that "simply because Oklahoma was *in one respect* a 'participant' in the coal market did not mean that *in all respects* its activity affecting the coal market constituted 'market participation'") (emphasis in original). As in *Wyoming*, while DDOL may at times participate in the market by directly procuring labor for public works projects, it also regulates the apprentice wages and apprenticeship

_____

to compete on a level playing field with Delaware contractors, the out-of-state contractor would become subject to all of DDOL's regulations, including the prevailing wage regulations governing compensation and training of apprentices in private contracts. Therefore, unless the out-of-state contractor is willing to establish a permanent place of business solely to service public works contracts and then to exit Delaware to bid on private contracts, the existing rules would also regulate the private contracts entered into by out-of-state contractors regardless of their situs.

28

programs implemented by registered sponsors regardless of whether such sponsors are performing on private contracts devoid of the State's direct involvement as a "purchaser, seller, or producer." *See Atl. Coast*, 48 F.3d at 717. In this respect, the prevailing wage conditions at issue exceed the bounds of the State's direct participation and affect the purchasing behavior of private parties. As such, the regulatory scheme "confer[s] upon [DDOL] the right to use its regulatory power to control the actions of others in [the] market," and "w[as] thus promulgated by [Delaware] in its role as a market regulator, not in its capacity as a market participant." *Id.*

The expansive scope of Delaware's regulations also distinguishes the case before us from the previously discussed market participation cases, and, in particular, from *White*, the broadest of the decisions. "The city order at issue in *White* included the workforce restriction in the city's notice for bids, so the contracting company was aware of the condition if it decided to bid and could elect not to participate in a sale under that requirement." *GSW, Inc. v. Long County, Ga.*, 999 F.2d 1508, 1515 (11th Cir. 1993) (discussing *White*, 460 U.S. at 206). In this respect, the city was operating much like a private entity in providing specific conditions within individual bid proposals. By contrast, the Delaware PWL and ATRR are untethered from any specific spending or procurement project, and apply not just to public works contracts; they also dictate the wage and employment terms of a registered sponsor's apprenticeship program regardless of the State's involvement with a particular construction project. As the Fifth Circuit recently observed, "a state cannot regulate others in the market in which it participates; the [market participant] doctrine only protects the state's

participation itself." *United Healthcare*, 602 F.3d at 625. Here, DDOL's involvement with the market extends beyond state participation.

Several cases addressing comparable prevailing wage laws of other states bolster this conclusion. In addressing the Pennsylvania Prevailing Wage Act, 43 PA. CONST. STAT. § 165-1 *et seq.* (2009), we previously observed in the preemption context that Pennsylvania was "clearly acting with an 'interest in setting policy,' not as a proprietor," in enacting and applying the statute. *Keystone Chapter, Assoc. Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 955 n.15 (3d Cir. 1994) (quoting *Boston Harbor*, 507 U.S. at 229). "The Prevailing Wage Act aims to ensure that workers receive adequate wages, a governmental objective." *Id.* Accordingly, it "would be difficult for the state to claim it is acting as a private market participant when it is making rules that raise the cost of its contracts." *Id.* We concluded in that decision that the state's interest in establishing labor standards and wages constituted an exercise of the State's traditional police power, not market participation. *Id.*

In an analogous decision, the Ninth Circuit addressed the payment of prevailing wages pursuant to California's apprenticeship regulations, observing:

> The State did not merely create apprenticeship standards in its contract with [Plaintiff] nor were the apprenticeship standards in this case created based upon unique needs that the detention facility project presented. The apprentice prevailing wage law applies uniformly to all public works contracts executed

> in the State of California and is a **mechanism through which the State regulates apprenticeship programs and the employment of apprentices** on public works projects. As this court has stated previously: "The state's involvement does not end with the awarding of the contract. Section 1777.5 is aimed at regulating contractors who work on public contracts."

*Dillingham Constr. N.A., Inc. v. County of Sonoma*, 190 F.3d 1034, 1038 (9th Cir. 1999) (citation omitted) (emphasis added). Consequently, the Ninth Circuit found the apprenticeship prevailing wage law to constitute "state regulation" of public works projects, rather than market participation. *Id.*

As in the latter cases, identical governmental objectives underlie the enactment of the Delaware Prevailing Wage regulations here. *See* 19-1000-1101 DEL. ADMIN. CODE § 1.2 ("The purpose of this chapter is to set forth labor standards to safeguard the welfare of Apprentices . . . ."); *id.* § 2.1.2 ("Provide for the establishment and furtherance of Standards of Apprenticeship and Training to safeguard the welfare of Apprentices and trainees."). As in *Dillingham*, Delaware's permanent place of business requirement was not enacted for purposes of a specific project or to service unique needs; as in *Keystone*, the instant regime raises the cost of the State's contracts with the primary purpose of advancing the State's interest in improving apprentice working conditions on all contracts. *See Dillingham*, 190 F.3d at 1038; *Keystone*, 37 F.3d at 955 n.15. Moreover, the regulations diverge from the Supreme Court's most recent pronouncement that funding

31

conditions in procurement agreements should be "specifically tailored to one particular job" to qualify as market participation. *Brown*, 554 U.S. at 70; *see also Hotel Empls.*, 390 F.3d at 215-16 (same). Here, the "legislative purpose is not the efficient procurement of goods and services, but the furtherance of a labor policy," namely, the setting of standards for training and payment of apprentices in public and private contracts alike.[26] *See Brown*, 554 U.S. at 70.

Another factor distinguishes the instant statutory regime from those that reflect mere market participation by private actors: the potential civil penalty threatened by the State for failure to comply with the prevailing wage conditions. The Delaware Code provides that "any employer who knowingly fails [ ] to pay the prevailing wage rates provided for under this section . . . shall, for each such violation, be subject to a civil penalty of not less than $1,000 nor more than $5,000 for each violation." 29 DEL. C. § 6960(e). Additionally, as the District Court noted, the PWL grants DDOL the right to revoke "the ability of a penalized employer to bid on future public construction contracts." *Id.* In this instance, DDOL directly threatened Tri-M with a forthcoming civil penalty for failure to conform its reimbursement of non-Delaware-registered apprentices to the

---

[26] DDOL's separate argument that Tri-M is ineligible for Delaware sponsor registration because it "voluntarily chose[ ] not to subject [its] apprenticeship program to DDOL oversight and regulation" further confirms that DDOL's role in enforcing the apprenticeship standards extends beyond participation in a discrete procurement contract, and entails regulation of a contractor's entire apprenticeship program. (*See* Appellant's Opening Br. at 29.)

ATRR prevailing wages. (*See* App'x at 451 (May 9, 2006 Letter from Nelson to Tri-M).)

"A governmental entity acts as a market *regulator* when it employs tools in pursuit of compliance that no private actor could wield, such as the threat of civil fines . . . ." *United Haulers*, 438 F.3d at 157 (citing *SSC Corp.*, 66 F.3d at 513) (emphasis added). In addressing the "regulator/market-participant distinction," we have noted with approval a Ninth Circuit decision that found, *inter alia*, the inclusion of a civil penalties provision in a state statute as indicative that the section constituted a regulatory measure outside the bounds of the market participant exception. *Hotel Empls.*, 390 F.3d at 215 (discussing *United States v. Lockyer*, 364 F.3d 1154, 1163 (9th Cir. 2004)); *see also Incorp. Vil. of Rockville Centre v. Town of Hempstead*, 196 F.3d 395, 399 (2d Cir. 1999) ("[W]hen the state avails itself of the unique powers or special leverage it enjoys by virtue of its status as sovereign, it is 'engaging in market regulation.'") (citation omitted). Where the state relies on its coercive power to effectuate compliance with contractual provisions, it distinguishes itself from a truly private actor, which must rely on contractual remedies to remedy breaches. Correspondingly, Delaware's ability to impose civil penalties upon out-of-state contractors for failure to pay the higher mechanic prevailing wage to unregistered apprentices confirms that its role is not merely that of a market participant.

Finally, we are guided by the Supreme Court's recent reminder of a central theme running through its market participation jurisprudence; one that is noticeably absent here:

33

> In each of the [market participation] cases the commercial activities by the governments and their regulatory efforts complemented each other in some way, and in each of them the fact of tying the regulation to the public object of the foray into the market was understood to give the regulation a **civic objective different from the discrimination traditionally held to be unlawful**: in the paradigm of unconstitutional discrimination **the law chills interstate activity by creating a commercial advantage for goods or services marketed by local private actors**, not by governments and those they employ to fulfill their civic objectives.

*Davis*, 553 U.S. at 347 (emphasis added). Unlike the important civic considerations that animated the governmental favoritism in other cases – unemployment and disenfranchisement in *White*, limited natural resources in *Reeves*, or environmental pollution in *Alexandria Scrap* – DDOL's "civic objective" in crafting the permanent place of business requirement here was protectionist – or retaliatory – in nature. *See infra*; *see also Tri-M Group*, 705 F. Supp. 2d at 345-46 (summarizing testimonial evidence showing that Delaware's permanent place of business requirement was enacted to retaliate against Pennsylvania for failing to recognize Delaware-registered apprentices). Indeed, the regulatory scheme here appears to fall "within the forbidden paradigm" precisely because the state's participation creates "a commercial advantage for goods or services marketed by local private actors." *Davis*, 553 U.S. at 348.

34

Despite its legitimate and considerable investment in procurement, DDOL acted as a market regulator in promulgating expansive labor regulations that control apprenticeship training and wage scales for all apprenticeship program sponsors, regardless of the State's direct participation in the market. Accordingly, the PWL and ATRR are subject to review for potentially imposing an undue burden on interstate commerce in contravention of the dormant Commerce Clause. *See White*, 460 U.S. at 210.

## II. Dormant Commerce Clause Review

The dormant Commerce Clause "prohibits the states from imposing restrictions that benefit in-state economic interests at out-of-state interests' expense, thus reinforcing 'the principle of the unitary national market.'" *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 298 F.3d 201, 210 (3d Cir. 2002) ("*Cloverland I*") (quoting *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192-93 (1994)).[27] States "cannot impede free market forces to shield in-state businesses from out-of-state competition," and, notably, "state laws that discriminate against out-of-state businesses by forcing them to 'surrender whatever competitive advantages they may possess' are especially suspect." *Cloverland I*, 298 F.3d at 210 (quoting *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S.

---

[27]*See also Granholm*, 544 U.S. at 472 ("This mandate 'reflect[s] a central concern of the Framers that . . . in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.").

573, 580 (1986)).

To decide that Delaware's permanent place of business requirement violates the dormant Commerce Clause, we must first assess "whether the state regulation at issue discriminates against interstate commerce 'either on its face or in practical effect.'" *Id.* (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)); *see also Am. Trucking Ass'n, Inc. v. Whitman*, 437 F.3d 313, 319 (3d Cir. 2006) ("[T]he level of scrutiny to be applied . . . is contingent upon whether the court finds that the statute or regulation is discriminatory").[28] Where a regulation discriminates against interstate commerce in favor of local business, such protectionism "is *per se invalid*, save in a narrow class of cases in which the [State] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Cloverland I*, 298 F.3d at 211; *see also Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Mktg. Bd.*, 462 F.3d 249, 262 (3d Cir. 2006) ("*Cloverland II*") ("Any statute that discriminates against interstate commerce on its face or in effect is thus subject to heightened scrutiny") (quotations and citation omitted).

If, however, the state regulation is not discriminatory and "regulates even-handedly" with merely "incidental" burdens upon interstate commerce, it is subject to a "balancing test whereby the statute must be upheld unless the burden imposed on interstate commerce is 'clearly excessive

---

[28] Statutes that discriminate by "practical effect and design," rather than explicitly on the face of the regulation, are similarly subjected to heightened scrutiny. *Am. Trucking*, 437 F.3d at 319 n.2 (quoting *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394 (1994)).

in relation to the putative local benefits.'" *Cloverland I*, 298 F.3d at 211 (quoting *Pike v. Bruce Church, Inc.*, 297 U.S. 137, 142 (1970)); *Davis*, 553 U.S. at 339 (same).

Here, the District Court found Delaware's statutory scheme to be discriminatory on its face, and we are not persuaded otherwise. DDOL contends repeatedly throughout its briefing that the regulatory regime is not discriminatory since it applies to all program sponsors regardless of state residency. Yet the District Court correctly observed that the ATRR "contain an express in-state presence requirement: a 'registrant' sponsor must 'regularly maintain[ ] a place of business in Delaware' that is not a site trailer, temporary structure, or post office box." *Tri-M Group*, 705 F. Supp. 2d at 344 (quoting 19-1000-1101 DEL. ADMIN. CODE § 3.1). Without establishing this in-state presence, an out-of-state contractor cannot become a registered sponsor of Delaware-registered apprentices, and is required to reimburse all employed apprentices at the higher mechanic's rate. *See* 19-1000-1101 DEL. ADMIN. CODE §§ 6.2.6 & 6.2.7. As such, the regulations on their face restrict sponsor registration – and the concomitant lower wages pertaining thereto – to in-state contractors or those possessing a permanent place of business in Delaware. This statutory scheme forces out-of-state contractors such as Tri-M to "surrender whatever competitive advantages they may possess" by burdening them with expenditures for a new local operation, or with the payment of increased wages on their contracts, thereby increasing their costs and decreasing their ability to submit competitive bids for projects.

Our conclusion here is informed by the Supreme Court's reasoning in *Granholm*, which rejected a New York

37

state law requiring out-of-state wineries to establish a branch factory, office, or storeroom in the state in order to ship wine directly to New York consumers. 544 U.S. at 470. At the same time, in-state wineries received the same shipping privileges simply by applying for a license. *Id.* Finding that the extra step of establishing an office for out-of-state wineries "[drove] up the cost of their wine," the Supreme Court found New York's "in-state presence requirement" discriminatory and applied heightened scrutiny, noting that such discrimination "runs contrary to our admonition that States cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Id.* at 474-75 (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)). Echoing this holding, we subsequently noted that "statutes that increase out-of-state competitors' costs are subject to heightened scrutiny under the Commerce Clause." *Am. Trucking*, 437 F.3d at 322.

The instant regulations explicitly treat in-state and out-of-state economic interests differently by compelling out-of-state contractors "to become [ ] resident[s] in order to compete on equal terms." *Granholm*, 544 U.S. at 474-75. Contrary to DDOL's misleading assertion that Tri-M voluntarily chose not to subject its apprenticeship program to DDOL oversight and regulation, Tri-M's purported "choice" in the matter would entail an assumption of costs not imposed upon in-state contractors. Accordingly, the regulations effectuate a protectionist bias against out-of-state contractors and are subject to heightened scrutiny.[29]

---

[29] Even were we to find the disputed regulations not facially discriminatory, we would nevertheless conclude that the regulations discriminate in effect by requiring out-of-state

38

Once the party challenging the statute meets its burden of showing discriminatory design or effect, the burden shifts to the State to demonstrate "'1) that the statute serves a legitimate local interest, and 2) that this purpose could not be served as well by available non-discriminatory means.'" *Freeman v. Corzine*, -- 629 F.3d 146,158 (3d Cir. Dec. 17, 2010) (quoting *Am. Trucking*, 437 F.3d at 319). Moreover, the "absence of evidence is dispositive, because '[t]he burden is on the State to show that the discrimination is demonstrably justified,' and we may '[u]phold state regulations that discriminate against interstate commerce *only* after finding, based on concrete record evidence, that a state's nondiscriminatory alternatives will prove unworkable.'" *Id.* at 161 (quoting *Granholm*, 544 U.S. at 492-93) (emphasis and alterations in original).

DDOL contends that it has a legitimate interest in safeguarding the safety and welfare of all apprentices by requiring a permanent place of business in Delaware, and that it lacks the resources to effectively monitor out-of-state apprenticeship programs for compliance with the Delaware standards. Its position is belied, however, by the State's conduct in this case, as well as the evidentiary history of the regulations at issue. The evidence and testimony adduced by the parties demonstrated the retaliatory motivations underlying the amendment of the Delaware regulations in 1999 to include the permanent place of business requirement. Prior to that time, the disputed regulations contained no such

---

contractors to pay higher mechanic's wage rates to registered apprentices merely because the registering contractor lacks a permanent place of business in Delaware.

residency condition, and Tri-M was a registered apprentice sponsor in Delaware. (App'x at A493-494.) As the District Court discussed, the State added the discriminatory residency requirement to the regulatory regime in response to similar legislative enactments by Pennsylvania and Maryland. *Tri-M Group*, 705 F. Supp. 2d at 346. Rather than advancing the legitimate state interest in improving apprentice labor and wage conditions, this amendment primarily reflected an intransigent "contest of wills over apprentice recognition" between neighboring states. *Id.*

Moreover, as the District Court concluded, the demonstrated existence of non-discriminatory alternatives for ensuring the safety and training of apprentices did not overcome the *per se* invalidity presumption applicable to discriminatory regulations. Tri-M's lack of a permanent place of business in Delaware did not prevent DDOL from conducting a thorough investigation to ensure Tri-M's compliance with the PWL and ATRR. *See id.* ("In essence, defendant argues that the DDOL cannot take out-of-state companies at their word, but did exactly that with respect to its investigation of plaintiff."). Indeed, other than a few conclusory statements to that effect, DDOL advanced no evidence to support its contention that monitoring out-of-state contractors working on in-state public projects is any more difficult than for in-state contractors, much less that such oversight is "unworkable," as *Granholm* requires. *See* 544 U.S. at 493. Indeed, we find the record devoid of evidence to substantiate DDOL's assertion that it could not verify out-of-state work standards through postal or electronic transmission of "certified payrolls, tax records, or other documentation as compared to a personal inspection of the apprentice's out-of-

40

state work job site." *See Tri-M Group*, 705 F. Supp. 2d at 346.

The "Commerce Clause cases demand more than mere speculation to support discrimination against out-of-state [interests]." *Granholm*, 544 U.S. at 492. DDOL's vague and unsubstantiated justifications for the discriminatory regulations failed to clear this hurdle, and we can discern no evidence confirming that the permanent place of business requirement actually advances legitimate interests or that "nondiscriminatory alternatives will prove unworkable."[30] *See Freeman*, -- F.3d --, 2010 WL 5129219, at *9. Accordingly, we conclude that the disputed regulations do not withstand heightened scrutiny and violate the dormant Commerce Clause.

## III. Congressional Authorization of the Discriminatory Regulatory Scheme

Finally, we consider DDOL's argument that Congress and the United States Department of Labor ("USDOL") expressly approved the challenged state regulation, thus removing any objection under the dormant Commerce Clause. The District Court rejected this argument, finding DDOL's "assertion that Congress's empowerment of the USDOL with 'regulatory power' somehow nullifies the dormant commerce clause issue presented in this case is, at a

---

[30] While DDOL could have potentially satisfied its burden by demonstrating that the pre-1999 regulatory framework – which did not mandate a permanent in-state present for out-of-state contractors – was unworkable, it adduced no argument or concrete evidence to support this position.

41

minimum, not compelling." *Tri-M Group*, 705 F. Supp. 2d at 343.  We agree.

It is well established that "Congress can authorize states to impose restrictions that the dormant Commerce Clause would otherwise forbid." *Cloverland I*, 298 F.3d at 210 n.13; *see also Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1304 (3d Cir. 1996) ("Congress may consent to state regulation that discriminates against interstate commerce.") (citation omitted).  "When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack" since Congress's commerce power in such instances is "not dormant, but has been exercised by that body." *Northeast Bancorp, Inc. v. Bd. of Gov'rs of Fed. Res. Sys.*, 472 U.S. 159, 174 (1985); *see also Life Partners, Inc. v. Morrison*, 484 F.3d 284, 291 (4th Cir. 2007) ("Congress holds the authority to 'redefine the distribution of power over interstate commerce' by 'permit[ting] the states to regulate the commerce in a manner which would otherwise not be permissible.'") (quoting *So. Pac. Co. v. Arizona*, 325 U.S. 761, 769 (1945)).

Importantly, however, congressional consent must be express, and is only evidenced "where Congress has 'affirmatively contemplate[d] otherwise invalid state legislation,' and '[w]here state or local government action is specifically authorized by Congress.'" *Norfolk So. Corp. v. Oberly*, 822 F.2d 388, 393 (3d Cir. 1987) (internal citations omitted).  "Because of the important role the Commerce Clause plays in protecting the free flow of interstate trade, [the Supreme] Court has exempted state statutes from the implied limitations of the Clause only when the congressional direction to do so has been 'unmistakably clear.'" *Maine*,

477 U.S. at 138-39 (quoting *Wunnicke*, 467 U.S. at 91); *see also Arab African Intern. Bank v. Epstein*, 10 F.3d 168, 172-73 (3d Cir. 1993) ("Congress must manifest its unambiguous intent before a federal statute will be read to permit or approve . . . a violation of the Commerce Clause.") (quoting *Wyoming*, 502 U.S. at 458). Moreover, the state has the "burden of demonstrating a clear and unambiguous intent on behalf of Congress to permit the discrimination against interstate commerce." *Wyoming*, 502 U.S. at 458.

DDOL presents the Fitzgerald Act, 29 U.S.C. § 50 *et seq.*, as reflecting Congress's intent to remove from Commerce Clause scrutiny State regulations implemented pursuant to the Act, including the discriminatory regulations at issue here. The Act authorized and directed the Secretary of Labor "to formulate and promote the furtherance of labor standards necessary to safeguard the welfare of apprentices . . . [and] to cooperate with State agencies engaged in the formulation and promotion of standards of apprenticeship." 29 U.S.C. § 50. The implementing regulations provide "a detailed regulatory scheme defining apprenticeship programs and their requirements, and establish a review, approval, and registration process for proposed apprenticeship programs administered by State Apprenticeship Councils under the aegis of the United States Department of Labor." *Hydrostorage, Inc. v. N. Cal. Boilermakers Local Joint Apprenticeship Comm.*, 891 F.2d 719, 731 (9th Cir. 1989), abrogated in part on other grounds as stated in *Engine Mfrs. Ass'n v. S. Coast Air Quality Maintenance Dist.*, 498 F.3d 1031, 1044 (9th Cir. 2007).[31]

---

[31] Pursuant to the pertinent regulations, the Department of Labor may "recognize" a State Apprenticeship Agency,

While DDOL is correct that the Fitzgerald Act provides for state regulation of apprenticeship standards and authorizes the Department of Labor to cooperate with state agencies in their regulation of apprenticeship programs, DDOL failed to establish that the Act and the implementing regulations expressly authorized the states to enact apprenticeship regulations that discriminate against out-of-state interests, let alone in an "unmistakably clear" manner. DDOL references several of the implementing regulations, each of which "relate only to eligibility for federal registration." *See Hydrostorage*, 891 F.2d at 731; *see also Assoc. Bldrs. & Contractors v. Perry*, 817 F. Supp. 49, 53 (E.D. Mich. 1992) (same). Notably, none of the referenced regulations clearly and unambiguously manifests Congress's intent to empower the State to discriminate against interstate commerce; the same may be said of the Act itself.

In fact, a comparison of the cases relied upon by DDOL is instructive. In *Norfolk Southern Corporation v. Oberly*, the district court examined whether developmental

---

which confers upon that agency the "non-exclusive authority to determine whether an apprenticeship program conforms to the published standards." 29 C.F.R. § 29.13. To be recognized, the state agency "must submit a State apprenticeship law . . . that conforms to the requirements of 29 CFR parts 29 and 30," which must include, *inter alia*, "a description of the basic standards, criteria, and requirements for program registration and/or approval," as well as "a description of policies and operating procedures which depart from or impose requirements in addition to those prescribed in this part." *Id.*

44

restrictions in the Delaware Coastal Zone Act were specifically authorized under the federal Coastal Zone Management Act of 1972, 16 U.S. § 1454 *et seq.* 632 F. Supp. 1225, 1245 (D. Del. 1986). After careful review, the court found that "Congress deliberately and repeatedly spoke of 'choices' to be made by the states," and expressly committed to the states the power "to resolve choices among competing uses in a manner that might otherwise be subject to Commerce Clause challenge." *Id.* at 1248.

Similarly, in *Prudential Insurance Company v. Benjamin*, in the context of the McCarron Act, 15 U.S.C. § 1011 *et seq.*, the Supreme Court observed that Congress "intended to declare, and in effect declared, that uniformity of regulation, and of state taxation, are not required in reference to the business of insurance." 328 U.S. 408, 431 (1946). Finding Congress's determination that "state taxes, which in [Congress's] silence might be held invalid as discriminatory, do not place on interstate insurance business a burden which it is unable generally to bear," the Court concluded that rejection of a state tax "would flout the expressly declared policies of both Congress and the state." *Id.* at 431, 433. Finally, DDOL's citation to *White* is also inapposite, for in that instance, "the federal regulations for each program affirmatively permit[ted] the type of parochial favoritism expressed in the order." 460 U.S. at 213 (noting that the Housing and Urban Development Act of 1968 required that "opportunities for training and employment be given to lower-income residents of the project area").

This jurisprudence makes clear that courts will find congressional authorization to discriminate against interstate commerce only where such behavior is clearly and

45

affirmatively contemplated by Congress, and expressly authorized in the statutory language. *See Oberly*, 822 F.2d at 393. The regulatory language defining eligibility for apprenticeship program registration that DDOL relies upon does not manifest in an unmistakably clear manner that Congress expressly envisioned or authorized a state to exercise its cooperative apprenticeship regulatory power to discriminate in favor of in-state parties.

Accordingly, we reject DDOL's argument that the United States Secretary of Labor's recognition of the Delaware apprenticeship agency as conforming with the pertinent implementing regulations immunizes the regulation in dispute from dormant Commerce Clause review. Only "Congress may authorize the States to engage in regulation that the Commerce Clause would otherwise forbid." *Maine*, 477 U.S. at 138. The Fitzgerald Act did not explicitly endow the Secretary with authority to permit discrimination against interstate commerce, and DDOL provided no other basis to conclude that discriminatory regulation may be authorized by a federal agency.

Because Congress did not authorize the discrimination at issue, DDOL's regulatory scheme constitutes impermissible discrimination under the dormant Commerce Clause.

## Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in this matter.

HARDIMAN, *Circuit Judge*, concurring,

I concur in the result in this case. Unlike my colleagues, I would hold that the Delaware Department of Labor (DDOL) forfeited its right to argue on appeal that Delaware acted as a market participant because it failed to raise that argument in the District Court.

I

DDOL provides no explanation for its failure to raise the market participant exception to the Dormant Commerce Clause in the District Court. Nevertheless, the Majority reaches this issue because the appeal "implicates significant issues of state sovereignty" and "raises a pure question of law." True as these conclusions are, they do not constitute "exceptional circumstances" necessary to overcome DDOL's forfeiture of a significant argument that it could have and should have made in the District Court.[1]

---

[1] The parties describe Delaware's failure to raise the market participant exception as a "waiver." As the Supreme Court has explained, "[w]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). Under this definition, Delaware's failure to raise this issue in the District Court is more properly characterized as a "forfeiture" than as a "waiver."

At issue in this appeal are some $10,000 in wages Tri-M paid to six apprentices who worked on a state-sponsored construction project. The project has been completed, so all that remains for adjudication is who must pay this relatively modest sum. In my view, this has little or no effect on the public interest and, regardless of which side prevails, cannot rise to the level of "manifest injustice." Accordingly, I would not excuse DDOL's forfeiture.

If we adhere to our forfeiture doctrine in this appeal, the constitutionality of the Delaware Prevailing Wage Law can be litigated in the next case and DDOL may, if it chooses, raise the market participant exception at that time. If the issue were joined and fully litigated in the District Court, we would have the benefit of a complete record and a reasoned decision by a trial judge.[2] Moreover, as the Majority rightly notes, litigants in thirty-seven other states would be free to

---

[2] Although the Majority states that "we are confronted solely with a pure question of law," Maj. Op. at 16-17, the opinion relies, to a large extent, on factual determinations regarding the scope of Delaware's regulatory scheme. For instance, the Majority finds that Delaware's apprenticeship wage and training regulations "are not limited to public works projects," because they apply, on their face, to any Delaware-registered apprentice sponsor operating in the State. The record does not reflect, however, whether the State actively regulates non-public-works projects or whether companies may opt out of the program once their contractual obligations to the State are complete. These are precisely the types of factual questions we expect a trial court to find, and our task would be made clearer if we allowed the District Court to do so in this case.

challenge regulations granting similar benefits to in-state companies. Maj. Op. at 13. As a result, district courts throughout the country would have the opportunity to review the constitutionality of a wide array of state procurement statutes, and in so doing provide appellate courts with a deeper understanding of this unsettled area of the law.[3] *Cf. Bagot v. Ashcroft*, 398 F.3d 252, 256 (3d Cir. 2005) (deciding the merits of a forfeited claim where the "proper resolution of the legal question, though not exactly simple, [wa]s reasonably certain").

I agree with the Majority that in some cases "the public interest is better served by addressing [an issue] than by ignoring it." Maj. Op. at 15-16 (citing *Barefoot Architect, Inc. v. Bunge*, -- F.3d --, 2011 WL 121698, at *10 (3d Cir. Jan. 14, 2011). For instance, in *United States v. Bagot*, 398 F.3d 252 (3d Cir. 2005), we exercised our discretion to review a deportee's claim after finding that "failing to consider Bagot's arguments would result in the substantial injustice of deporting an American citizen." *Id.* at 256. Similarly, in *United States v. Petersen*, 622 F.3d 196, 202 n.4 (3d Cir. 2010), we held that, at least where the "public reputation of judicial proceedings" is at stake, we have an "institutional" interest in resolving unsettled questions regarding a defendant's trial rights. *Id.* at 202 n.4. Finally, in *Bunge*, we held that inadvertent mistakes, such as a party's

---

[3] As the Majority notes, "application of the distinction between 'market participant' and 'market regulator' has [] occasioned considerable dispute in the Supreme Court's jurisprudence," Maj. Op. at 26 n.24, and our own jurisprudence "reflects limited opportunity to opine regarding the exception," *id*. at 21.

3

invocation of "the wrong definition of the tort," does not necessarily trigger the application of the waiver doctrine. 2011 WL 121698, at *10.

Unlike in *Bagot*, here I see no exigency that necessitates a prompt resolution of the market participant issue. Indeed, as noted above, a trial court's thorough analysis of the legal and factual questions raised on appeal would be tremendously helpful in deciding this difficult issue. Moreover, the "institutional" interest in resolving this issue is minimal. There is no evidence that lower courts are reaching inconsistent results or that states are responding to the legal uncertainty by halting enforcement or repealing regulations that may be discriminatory. The fact that the issue is one of constitutional import does not alone transform it into a matter of public importance, as we have enforced waivers in weightier circumstances, including those affecting constitutional rights. *See e.g.*, *United States v. Lockett*, 406 F.3d 207, 212 (3d Cir. 2005) (holding that defendant waived his legal argument for "limited consent" under the Fourth and Fourteenth Amendments by failing to raise it before the district court); *Brennan v. Norton*, 350 F.3d 399, 418 (3d Cir. 2003) (finding that defendant waived his legal argument for relief under the Petition Clause).

Finally, there is no evidence in this record to suggest that Delaware's failure to raise the market participant issue was inadvertent. *Cf. Bunge*, -- F.3d --, 2011 WL 121698, at *10. Indeed, given that the market participant doctrine has long been a recognized exception to the dormant Commerce Clause, it is unlikely that counsel for DDOL simply missed the issue. The DDOL could just as plausibly have decided to pursue an alternative theory after evaluating the relative merits of the arguments. *See United States v. Nee*, 261 F.3d

4

79, 86 (1st Cir. 2001) ("Th[e] 'raise-or-waive rule' prevents sandbagging; for instance, it precludes a party from making a tactical decision to refrain from objecting, and subsequently, should the case turn sour, assigning error.") (citation omitted). Just as private litigants may not "jump from theory to theory like a bee buzzing from flower to flower," *United States v. Rose*, 538 F.3d 175, 180 (3d Cir. 2008) (internal citations and quotations marks omitted), a state should not be permitted to do so in the absence of truly exceptional circumstances.

For these reasons, I concur in the Court's judgment.