**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-3265
_____

ALEXANDER SMITH,

Appellant

v.

CITY OF ATLANTIC CITY; SCOTT EVANS, as Chief of
the Atlantic City Fire Department; THOMAS J. CULLENY,
JR., Deputy Chief of the Atlantic City Fire Department
_____

On Appeal from the United States District Court
for the District of New Jersey
(No. 1:19-cv-06865)
District Judge: Honorable Christine P. O'Hearn
_____

Argued: October 30, 2024

Before: CHAGARES, *Chief Judge*, PORTER, and CHUNG,
*Circuit Judges*.

(Filed: May 30, 2025)


Rebecca R. Dummermuth
Kayla A. Toney **[Argued]**

First Liberty Institute
1331 Pennsylvania Avenue NW
Suite 1410
Washington, DC 20004

Jeffrey C. Mateer
David J. Hacker
First Liberty Institute
2001 W Plano Parkway
Suite 1600
Plano, TX 75075

Parker W. Knight, III
Joshua C. McDaniel
Harvard Law School
Religious Freedom Clinic
6 Everett Street
Suite 5110
Cambridge, MA 02138

Kathryn F. Mahoney
Harvard Law School
Religious Freedom Clinic
216 5th Street
2nd Floor
Leominster, MA 01453
*Counsel for Appellant Alexander Smith*

Nicholas Delgaudio
Cleary Giacobbe Alfieri & Jacobs
955 State Route 34
Suite 200
Matawan, NJ 07747

Ruby Kumar-Thompson **[Argued]**
Cleary Giacobbe Alfieri & Jacobs
169 Ramapo Valley Road
Upper Level 105
Oakland, NJ 07436
　　　*Counsel for Appellees City of Atlantic City,*
　　　*Scott Evans, and Thomas J. Culleny, Jr.*

Brian P. Morrissey
Aaron P. Haviland
Drew K. Cypher
Mikayla Culbertson
Sidley Austin LLP
1501 K Street NW
Washington, DC 20005

Nicholas Reaves
Yale Law School
Free Exercise Clinic
1919 Pennsylvania Avenue NW
Suite 400
Washington, D.C. 20006
　　　*Counsel for Amicus Curiae National Council of Young*
　　　*Israel, The Aleph Institute, The Sikh American Veter-*
　　　*ans Alliance, and Rabbi Jacob Goldstein in Support of*
　　　*Appellant*

Natalie C. Rhoads
Liberty University School of Law
1971 University Boulevard
Lynchburg, VA 24515

*Counsel for Amicus Curiae Rodney D. Chrisman, Rena M. Lindevaldsen, David McGinley, Natalie C. Rhoads, Erik Stanley, and Scott E. Thompson in Support of Appellant*

Justin Aimonetti
Dechert LLP
1900 K Street NW
Washington, DC 20006

Michael H. McGinley
Dechert LLP
2929 Arch Street
18th Floor, Cira Centre
Philadelphia, PA 19104

Steven T. McFarland
Christian Legal Society
8001 Braddock Road
Suite 302
Springfield, VA 22151
    *Counsel for Amicus Curiae Christian Legal Society and National Association of Evangelicals in Support of Appellant*

Nicholas M. Bruno
Beck Redden LLP
1221 McKinney Street
Suite 4500
Houston, TX 77010
    *Counsel for Amicus Curiae Coalition for Jewish Values, American Hindu Coalition, and Jewish Coalition for Religious Liberty in Support of Appellant*

Robert K. Kelner
Eli Nachmany
Covington & Burling LLP
850 10th Street NW
One City Center
Washington, DC 20001

*Counsel for Amicus Curiae Firefighters and Paramedics Calvert Potter, Steven Chasin, Jasper Sterling, and Hassan Umrani in Support of Appellant*

Jeremy B. Rosen
Horvitz & Levy LLP
505 Sansome Street
Suite 1550
San Francisco, CA 94111

Scott P. Dixler
Jasjaap S. Sidhu
Horvitz & Levy LLP
3601 W Olive Avenue
8th Floor
Burbank, CA 91505

*Counsel for Amicus Curiae Appellants The Sikh Coalition and Islam and Religious Freedom Action Team in Support of Appellant*

―――――――――――

OPINION OF THE COURT

―――――――――――

**PORTER**, *Circuit Judge*, delivers the opinion of the Court as to Parts I, II, III.B., and III.D by a unanimous decision of the merits panel and as to parts III.A and III.E joined by CHAGARES, *Chief Judge*. CHUNG, *Circuit Judge*, delivers the opinion of the Court as to part III.C joined by CHAGARES, *Chief Judge*.

Alexander Smith is a Christian who works for the Atlantic City Fire Department. The City prohibits Smith from growing a beard of any length, contrary to his religious beliefs. After the City denied his accommodation, Smith sued alleging violations of the Free Exercise Clause, the Equal Protection Clause, and Title VII's accommodation and anti-retaliation provisions. The District Court denied Smith's motion for a preliminary injunction. Following discovery, it granted summary judgment for the City on all four claims. We will vacate the District Court's judgment as to Smith's Title VII accommodation claim and free-exercise claim but will affirm on the equal protection claim and the Title VII retaliation claim. We will also reverse the denial of Smith's motion for a preliminary injunction.

I

A

Firefighters engaged in fire suppression face danger from smoke and fume inhalation. The City protects its firefighters by requiring them to don air masks in "hazardous" and

6

"confined" spaces. J.A. 73. These "self-contained breathing apparatuses," or "SCBAs," form a seal on the firefighter's face to keep out hazardous air and pump in clean air. The SCBA works when the seal becomes damaged or loose, but the supply of clean air depletes faster.

To ensure that firefighters have properly sealed SCBAs, the City has strict grooming standards. Men can have neatly trimmed sideburns and mustaches, but they cannot wear beards or goatees. They must "be clean shaven while on duty," though off-duty firefighters need not be clean-shaven if called to duty during an emergency. J.A. 71. But "[i]n no case shall facial hair, including stubble, inhibit the seal of the [SCBA]." *Id.* The City has two exceptions to the policy. First, captains may permit firefighters "to deviate" from the policy (as it relates to the requirement to wear an SCBA) but they are personally "responsib[le] for the results of any deviation." J.A. 73. Second, as an informal matter, "administrative employees like . . . Smith and the Fire Chief were not scheduled" for fit tests even though they are firefighters and thus subject to the same policy. Appellant's Br. 11.

Smith is classified as a firefighter. He was hired as one, he is on the firefighters' retirement plan, and he is covered by the firefighters' union bargaining agreement. But Smith has not fought a fire since 2015. He has not been fit tested for an SCBA since then, either.

That is because Smith works as an Air Mask Technician. He maintains the SCBAs and fills and refills them with air for firefighters on scene. When he is on scene, Smith is required to position himself away from the smoke and fumes so that firefighters can safely remove their SCBAs and switch air tanks. It is a critical role: Smith is the City's "only assigned Air

7

Mask Technician." Appellant's Br. 7. Without him, his comrades could not safely enter buildings or engage in up-close fire suppression. Because of this, the City has ordered Smith to *stop* engaging in fire suppression so that he can man the Air Truck Unit. The City has no procedure that would enable someone else to man the Unit in his absence.[1]

The City has other protocols that insulate Smith from fire suppression duties. When a fire is "serious," the City relies on a Rescue Intervention Team whose role is to "rescu[e] injured firefighters." J.A. 278–79. The company on scene can also call "second and third due companies [who] are deployed to the scene of the fire to back up the initial responding" team. J.A. 307. When this is insufficient, the City can summon some or all of its personnel on an emergency call-back. During Smith's time with the City, these calls have happened at a rate of about once or twice per year. Lastly, the City can call on neighboring towns to supply manpower to support an emergency response.

B

Smith believes men should grow and maintain beards based on the teachings of Holy Scripture and early Christian theologians. Beards, Smith says, emulate Jesus Christ and the biblical prophets; they are symbols of masculinity, maturity, and man's natural role as "head and leader." J.A. 186–88.[2] Smith began

---

[1] The City also has "a handful" of employees trained as Air Mask Technicians who are not assigned to that role. J.A. 654.

[2] "[B]eards . . . were once serious, symbolic matters" that pitted Christian theologians against one another during antiquity, the Great Schism of 1054, and the Protestant Reformation. Ted

8

to grow a beard in December 2018 and submitted an accommodation request the next month asking that he "continue to wear [his] beard." J.A. 173. He did not offer any compromises regarding length but did not insist his request was all-or-nothing, either. The City never discussed with Smith whether certain compromises or alternative accommodations would satisfy his request. While he waited for an answer, the City barred Smith from responding to fires. One of Smith's captains also "questioned" Smith "about [his] beard and repeatedly told" him to shave. J.A. 231. Eventually, Smith was called into a meeting with Chief Evans and Deputy Chief Culleny, who handed Smith a letter denying his request and ordering him to shave. Evans and Culleny told Smith they would "immediately suspend him without pay" if he did not comply. J.A. 672.

C

Smith sued. The District Court denied Smith's motion for a preliminary injunction, finding that none of his four claims were likely to succeed on the merits. While discovery was underway, the remnants of Hurricane Isaias struck Atlantic City. The City ordered Smith to engage in fire suppression, even though its own policy (prior to and during litigation) barred Smith from doing so and the City had not attempted to call for mutual aid. This was the first time in at least thirty-one years that the City ordered an Air Mask Technician to fight a fire. The City now admits that there were no fires at all on that day

---

Olsen, The Wars Over Christian Beards, *Christianity Today* (Sept. 2013), https://perma.cc/LT7X-5QQN. We take no position on that debate: "Courts are not arbiters of scriptural interpretation" or any other theological dispute. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981).

and that firefighters did not have to don their SCBAs. Smith refused to fight the fire. Years had passed since he had been trained for fire suppression, so Smith claims he would have endangered his own life and that of his comrades by complying with the order.[3] Despite claiming all hands were called in that day, the City now says that it called another firefighter to respond in his stead. The City charged Smith with insubordination and suspended him for forty days, including twenty without pay. A year after the incident, the State of New Jersey sanctioned the City for deploying firefighters without quarterly training.

The City moved for summary judgment. The District Court granted the City's motion and Smith timely appealed.

## II

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under § 1291. We conduct plenary review for an appeal of a summary judgment. *Bruni v. City of Pittsburgh*, 941 F.3d 73, 82 (3d Cir. 2019). We review the denial of a motion for a preliminary injunction for abuse of discretion. *Free Speech Coal. v. Att'y Gen.*, 974 F.3d 408, 430 (3d Cir. 2020).

## III

### A

---

[3] Chief Culleny offers a different version of events: he says Smith refused to respond because "his attorney advised him not to work in the line and that it was against his settlement agreement and would affect his pay." J.A. 613.

We begin with Smith's claim for relief under the Free Exercise Clause. Religious liberty is "our first freedom." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 23 (2020) (Gorsuch, J., concurring); *see* Michael W. McConnell, *Why Is Religious Liberty the "First Freedom"?*, 21 Cardozo L. Rev. 1243 (2000). Contemporary free-exercise doctrine is guided by the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990) and its progeny. *Smith* provides that "the right of free exercise does not relieve an individual of the obligation to comply with a . . . neutral law of general applicability." *Id.* at 879 (internal quotation marks omitted). Such laws do not contravene the Free Exercise Clause and are subject to rational basis review. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 165 (3d Cir. 2002).

1

We need not decide whether the City's policy is neutral. Even a neutral law will fail general applicability, and thus fall within the Free Exercise Clause, if it "'invite[s]' the government to consider the particular reasons for a person's conduct." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (quoting *Smith*, 494 U.S. at 884) (alteration in original). This can happen through one of three means. First, the government action enumerates an exception to the challenged policy. *Fraternal Ord. of Police v. City of Newark*, 170 F.3d 359, 366 (3d Cir. 1999). Second, the government "creat[es] . . . a formal mechanism for granting exceptions . . . regardless of whether any exceptions have been given." *Fulton*, 593 U.S. at 537. Third, the government does not provide enumerated or formal exceptions to the challenged act but grants them as a matter of practice. *See Tenafly*, 309 F.3d at 167–69 (facially neutral and generally applicable law was enforced in non-neutral manner).

Not just any exception will do. General applicability also requires a relevant comparator; that is, a real or hypothetical application of an existing government exception that would "undermine the [government's] interest." *Fraternal Ord.*, 170 F.3d at 366. Thus, in *Fraternal Order*, Newark's policy of permitting undercover officers to grow beards did not undermine the city's interest in "*esprit de corps*," because those officers "obviously [were] not held out to the public as law enforcement person[nel]." *Id.* (citation omitted) (second alteration in original). Likewise, we noted, Oregon's "prescription exception to [its] drug law" in *Smith* "d[id] not necessarily undermine Oregon's interest in curbing the unregulated use of dangerous drugs" like peyote. *Id.* But Newark still failed general applicability: it undermined the *esprit de corps* by permitting beat cops, who are held out to be police officers, to grow beards for medical reasons. *Id.*

The City has an interest in protecting firefighters from hazardous air, specifically "when operating in or around . . . atmosphere[s] that [are] hazardous," that are "suspected of being hazardous," that "may rapidly become hazardous," or when "working below ground level [or] . . . in confined spaces." J.A. 73. So the rule will fail general applicability if that interest is or could be undermined by the City's grooming regime's exceptions.

The specific, enumerated exceptions to the grooming regime do not undermine general applicability. While firefighters may sport five o'clock shadows when they are called in for an emergency, or grow out neatly trimmed mustaches and sideburns, these do not interfere with the SCBA. Indeed, the text of the policy provides, "[i]n no case shall facial hair . . . inhibit the seal of the [SCBA]." J.A. 71. Whether a chinstrap, goatee, or General Burnside's sideburns, no firefighter may wear any

form of facial hair that would undermine the City's interest under these rules.

But two exceptions—one practical exception and one discretionary regime—render the City's policy not generally applicable. First, the City has long permitted administrative staff, all of whom are firefighters subject to the SCBA rule, to forgo fit testing. Fit testing "ensure[s] they can wear the SCBA mask with a proper seal," Appellee's Br. 36, and "[fifteen] to [twenty] masks fail the tests every year from normal wear and tear." Appellant's Br. 57 (citing J.A. 303). Like the grooming policy, the fit-testing requirement implicates the City's interest in ensuring proper mask fit and a safe supply of oxygen to firefighters. In failing to subject administrative employees to fit testing, the City has permitted certain kinds of conduct that undermine its interest while disfavoring religious conduct undermining the same interest. That fails general applicability.

Second, the City's grooming regime has built-in discretion. Captains may "deviate" from the SCBA policy and permit any sort of conduct as long as they "bear[] full responsibility for the results of any deviation." J.A. 73. We have no record confirming whether an exception has been granted by a captain under this rule, but we need none. The mere creation of an exception mechanism that permits undermining the City's interest destroys general applicability. *Fulton*, 593 U.S. at 537.

The City objects that its grooming policy complies with state and federal regulations, so a religious exemption here would subject the City to liability under both provisions. Appellee's Br. 17 (citing 29 C.F.R. § 1910.134; N.J.A.C. § 12:100-10.10). That argument suggests a rule that is not generally applicable on its face is generally applicable, after all,

13

when it complies with an overriding state or federal law which is *itself* allegedly neutral and generally applicable.

We reject the City's multi-layered theory of free exercise. *Fulton* mandates a simple rule: "The creation of a formal mechanism for granting exceptions renders a policy not generally applicable . . . because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy of solicitude." 593 U.S. at 537 (quoting *Smith*, 494 U.S. at 884). There is no state or federal regulatory exception. "If then the courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). In other words, the City's policy, the state regulation, and the federal regulation all necessarily yield to the Constitution. U.S. Const. art. VI, cl. 2.

In her dissent, Judge Chung argues that the City's formal and informal exceptions are exceptions to the SCBA requirement but not the grooming regime itself. But the City flatly states the grooming regime exists "[t]o ensure the proper fit of SCBAs." Appellee's Br. 6. The SCBA policy requires "[t]he standardized use of the SCBA," and grooming is required to ensure standardized mask fit. J.A. 73. Smith asserts the captain's discretion rule governs the grooming requirements and the City has never said otherwise.

Judge Chung's reliance on *Spivack* and *Lukumi* is misplaced. *Spivack* concerned an old policy that gave the government "significant discretion," and a superseding policy "which eliminated the religious exemption altogether." *Spivack v. City of Philadelphia*, 109 F.4th 158, 172 (3d Cir. 2024). The question was indeed about "which policy was at issue," Judge

14

Chung Op. Diss. 6, because—unlike here—it was possible for only one of the policies to apply. In *Lukumi*, the Court did not consider different ordinances in isolation from each other, but analyzed them collectively to determine their shared interests and the impact the exemptions had on those collective interests. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993) ("[the] Ordinances . . . advance two interests: protecting the public health and preventing cruelty to animals. The ordinances are underinclusive for those ends."). Besides, to allow the City to divvy up its exemption regimes provision-by-provision would permit governments to subvert free exercise through clever drafting. We decline that approach.

2

Because the City's policy is not generally applicable, it is subject to the scrutiny of the Free Exercise Clause. The parties disagree, however, as to whether that scrutiny is intermediate or strict. Smith says strict scrutiny applies, but the City asserts that neutral yet not generally applicable laws "can only reach intermediate scrutiny." Appellee's Br. 14. The District Court, more narrowly, applied that rule to "the public employment context" alone. J.A. 10. The District Court reached this conclusion relying on dicta in *Tenafly* describing *Fraternal Order* as applying intermediate scrutiny in light of "a government's need to function efficiently." J.A. 9 (quoting *Tenafly*, 309 F.3d at 166 n.27).

Our case law has been inconsistent on this point. In *Fraternal Order*, we "assume[d]" intermediate scrutiny applied to the public employment context, though we did not adopt it. 170 F.3d at 366 n.7. *Tenafly* merely repeated that assumption in dicta and added support for the argument. 309 F.3d at 166 n.27.

15

And in *Blackhawk v. Pennsylvania*, then-Judge Alito asserted—also in dicta—that *Fraternal Order* "applied strict scrutiny." 381 F.3d 202, 208 (3d Cir. 2004) (citing *Fraternal Ord.*, 170 F.3d at 366–67).

Strict scrutiny is the appropriate standard in all free-exercise cases failing either *Smith*'s neutrality requirement or its general-applicability requirement. On only one occasion in the past fifty years has the Supreme Court applied intermediate scrutiny to a free-exercise claim, and that was in the military context. *Goldman v. Weinberger*, 475 U.S. 503 (1986). Congress abrogated that narrow exception; strict scrutiny now applies universally. *See Singh v. Berger*, 56 F.4th 88 (D.C. Cir. 2022) (applying strict scrutiny to military case). It applies for good reason: there is concern that our current Free Exercise Clause jurisprudence is too weak and is "lone among the First Amendment freedoms" in its weaknesses. *Fulton*, 593 U.S. at 543 (Barrett, J., concurring). To apply a standard less than strict scrutiny would falsely suggest that freedom of religion is "a second-class right, subject to an entirely different" and weaker "body of rules than the other Bill of Rights guarantees." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 70 (2022) (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)).

The Supreme Court has firmly taken the side of strict scrutiny. In *Tandon v. Newsom*, the Court embraced strict scrutiny as the general rule of review for laws failing *Smith*. 593 U.S. 61, 62 (2021). And in *Kennedy v. Bremerton School District*, the Court extended that rule to a public employment case involving "policies [that] were neither neutral nor generally applicable." 597 U.S. 507, 526 (2022). The Court discerned no distinction between partial and neutral laws, or the targeting of government employees versus private-sector workers. It

applied strict scrutiny, the one standard to rule all Free Exercise Clause claims not governed by *Smith*.

3

"A government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." *Fulton*, 593 U.S. at 541 (quoting *Lukumi*, 508 U.S. at 546) (internal quotation marks omitted). That interest cannot be asserted "at a high level of generality." *Id.* Instead, the government interest must be reviewed in light of "the asserted harm of granting specific exemptions to particular religious claimants." *Id.* (quoting *Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 430–32 (2006)).

The City asserts a generic safety interest.[4] But we can "properly narrow[]" and then review. *Id.* Occasionally, the City "lack[s] . . . available firefighters" or has "an overwhelming amount of fire calls." Appellee's Br. 4. Either scenario could require Smith to respond in a fire suppression capacity. Should that occur, and should his accommodation be granted, there is a risk that Smith's facial hair would interfere with the SCBA seal. A broken seal would "lead[] to a reduction in air tank time, which is a danger for firefighters." Appellee's Br. 16. Without an adequate supply of air, Smith might struggle to carry out his duties or become incapacitated. In the latter scenario, it could be necessary for the City to send its Rescue Intervention Team to carry the gear-laden firefighter out from the

---

[4] The City also argues that its need to comply with state and federal laws is sufficient justification to survive strict scrutiny. For the reasons above, we disagree.

17

conflagration. "[S]afety is undoubtedly an interest of the greatest importance," and, as applied to Smith's exemption request, it is sufficiently compelling. *Fraternal Ord.*, 170 F.3d at 366.

But the City fails narrow tailoring. "[N]arrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest." *Tandon*, 593 U.S. at 63. The City could remove Smith from fire suppression duty as it did before 2020 or reclassify him as a civilian who is not subject to the SCBA and grooming policies. It could, as a simple fix, at least *try* and fit test Smith with facial hair to see if his facial hair, at any length, would interfere with the SCBA to a point that creates the risk of air leakage that the City fears. *See Potter v. District of Columbia*, 382 F. Supp. 2d 35, 38 (D.D.C. 2005) (Muslim employee seeking exception passed fit test with beard). There are likely more solutions than these three, but "so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. Because the policy fails strict scrutiny, we will vacate the District Court's judgment.

B

We follow a two-part test for Smith's Title VII accommodation claim. First, the claimant must limn a prima facie case showing (1) "a sincere religious belief that conflicts with a job requirement" and (2) that he "told the employer about the conflict"; and (3) that he faced "discipline[] for failing to comply." *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 319 (3d Cir. 2008). Second, if the claimant succeeds, "the burden shifts to the employer to show" that accommodating the religious belief "would work an undue hardship upon the employer." *Webb v. City of Philadelphia*, 562 F.3d 256, 259 (3d Cir. 2009). The District Court and parties assume Smith

18

establishes a prima facie case, so we will turn to the undue hardship analysis.

The District Court concluded that, because the City "made a good-faith effort to reasonably accommodate" Smith, it was not liable regardless of undue hardship. J.A. 16 (quoting *Webb*, 562 F.3d at 259). That is a misreading of Title VII and precedent. Search the text of the religious-accommodations clause, and the phrase 'good faith' is nowhere to be found. 42 U.S.C. § 2000e(j). There is no separate 'good faith' exception: a well-meaning employer can fail to accommodate, and a bad-faith employer can lack the ability to accommodate without undue hardship. Good faith, properly understood, is circumstantial evidence supporting the possibility that an employer complied with Title VII by offering an appropriate accommodation or is telling the truth when it claims that an accommodation would work undue hardship. *See Shelton v. Univ. of Med. & Dentistry of N.J.*, 223 F.3d 220, 224 (3d Cir. 2000) (citing *Getz v. Pennsylvania*, 802 F.2d 72, 73 (3d Cir. 1986)) (implying good faith in case where accommodation was offered). In particular, our precedent indicates that an employer *must* consider an accommodation request, and "not merely . . . assess the reasonableness of a particular possible accommodation." *Groff v. DeJoy*, 600 U.S. 447, 473 (2023). Good faith is useful insofar that it shows an employer considered the claim, but could not accommodate without undue hardship, *or* declined to consider any accommodation as futile due to the presence of undue hardship. But good faith is not by itself a cure for a Title VII breach. Once the claimant limns a prima facie case, "[the] employer . . . has a defense *only* if hardship is 'undue.'" *Id.* at 472 (emphasis added).

Under *Groff*, an employer shows an undue hardship if the accommodation would create a burden that is "substantial in

the overall context of the employer's business." *Id.* at 468. "[A] hardship is more severe than a mere burden." *Id.* at 469. And "'undue' means that the requisite burden . . . must rise to an 'excessive' or 'unjustifiable' level." *Id.* (citations omitted). Post-*Groff*, we may still evaluate "[b]oth economic and non-economic costs" as a source of undue hardship. *Webb*, 562 F.3d at 260; *Groff*, 600 U.S. at 470 ("courts must apply the test in a manner that takes into account all relevant factors in the case at hand"). In all of this, our analysis is rooted in "common-sense" reasoning and a keen review of the facts. *Groff*, 600 U.S. at 471.

No doubt, the City has an interest in preserving employee safety. Yet mere recitation of an interest does not establish undue hardship. It is telling that no Air Mask Technician has been called to engage in fire suppression for several decades. As for the 2020 emergency call, Smith was ordered to report after the City breached several layers of protocol for an emergency that did not even require an SCBA. The City can only theorize a vanishingly small risk that Smith will be called in to engage in the sort of firefighting activities for which an SCBA is required. There are no other personnel—whether administrators or active firefighters—who are seeking an accommodation relating to the SCBAs, so the risk that the City will be unable to respond to an emergency safely is all the more unlikely. On these facts, the City has not undisputably shown that Smith's original request "to continue to wear [his] beard" would impose an undue hardship. J.A. 173. Accordingly, we will vacate the judgment on Smith's Title VII accommodation claim.

C

Smith argues that the City violated Title VII by retaliating against him for requesting an exemption from the City's

grooming policy. Courts must evaluate Title VII retaliation claims under a three-part framework. First the Plaintiff must make a prima facie showing that: "(1) [he] engaged in activity protected by Title VII; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action." *See Moore v. City of Phila.,* 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir. 1995)). If the Plaintiff makes this showing, the burden shifts to the employer to advance a "legitimate, non-retaliatory reason" for its conduct. *Id.* at 342 (quotation omitted). If the employer makes such a showing, the burden shifts back to the Plaintiff "to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (quotation omitted).

1

There is no genuine dispute that Smith has satisfied the first element of a prima facie retaliation case because he requested an accommodation, lodged a complaint with HR in furtherance of that request, and filed this lawsuit. All are activities protected by Title VII.

2

We conclude that Smith satisfies the second requirement of a prima facie case. An adverse action must be "materially adverse[,]" such that it is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Smith asserts a number of adverse actions which we address in turn.

21

Smith alleges that the City's denial of his request for religious exemption from the Grooming Standards is an adverse action. But the approval or denial of any accommodation request, including Smith's, is an anticipated part of the process. Accordingly, anyone entering the process, including Smith, does so knowing of the potential for denial. In other words, the potential for denial does not dissuade employees from seeking an accommodation. It follows that the realization of that known potential does not transform the denial into a dissuasive action. If we were to conclude that the denial of a request for accommodation alone is an adverse employment action, then that prong of the prima facie test would be superfluous—every Title VII failure to accommodate claim would automatically end in an adverse employment action for purposes of a retaliation claim.

Smith also asserts that he suffered an adverse employment action when he was told to report to work clean shaven or be suspended. J.A. 210, 441. Ordering Smith to report to duty clean shaven and noting the normal disciplinary consequences for failing to do so, though, was consistent with, and was part of, the denial itself. *Id.* As we have noted above, a denial itself is not an adverse employment action.

Smith next alleges that the City failed to engage in an interactive process with him when considering his request for accommodation. Appellant's Br. at 40. Smith has forfeited this theory of adverse employment action because raising a new theory of adverse action on appeal is untimely. *Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 416 (3d Cir. 2011) ("It is axiomatic that arguments asserted for the first time on appeal are deemed to be [forfeited] and consequently are not susceptible

22

to review in this Court absent exceptional circumstances." (internal quotations omitted)).[5]

Finally, Smith asserts that he suffered an adverse action because the City sent him to perform fire suppression in the tropical storm emergency without training and then suspended him when he did not follow orders.[6] Dist. Ct. Dkt. No. 122 at 27–28. Being ordered to respond to an emergency that could require fire suppression, in the absence of up-to-date fire suppression training, could "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*

---

[5] Smith presents no argument for exceptional circumstances that would allow him to bring a new theory of adverse action on appeal.

[6] Smith first asserted this adverse action in his opposition to summary judgment and appended an affidavit to support this theory of liability. Dist. Ct. Dkt. No. 122 at 27; No. 122-2 at 13. The District Court concluded this theory was "in complete contrast to his deposition testimony" and thus "insufficient to withstand a motion for summary judgment." J.A. 22. It is true that Smith's legal theory in opposing summary judgment contradicted his prior legal position at deposition in that it adds a new allegedly retaliatory action. *Compare* J.A. 413 (stating in deposition that the retaliatory action was limited to "just the request's denial") *with* Dist. Ct. Dkt. No. 122 at 27 (adding as retaliatory actions his tropical storm assignment and suspension). This new legal theory is not based on any facts that contradict his deposition testimony and, in fact, relies on facts developed therein. We therefore do not adopt the District Court's reasoning and will consider this adverse employment action asserted by Smith.

*N.*, 548 U.S. at 57. Thus, we conclude that Smith has made out the second prong of a prima facie retaliation case as to this action.

3

Smith's prima facie case fails at this prong as he does not create a genuine dispute that his protected activity caused the City to assign him to the tropical storm and then suspend him. As evidence of causation, Smith offered very little in his summary judgment and appellate briefing, asserting in both without factual support or additional argument that causation can be inferred from the timing of the protective activity and the adverse actions.[7] Appellant's Br. at 40–41; Dist. Ct. Dkt. No. 122 at 25–28. This is insufficient to establish causation, as more than eighteen months had elapsed since Smith's engagement in protected conduct and the tropical storm assignment. *See Qin v. Vertex, Inc.*, 100 F.4th 458, 477 (3d Cir. 2024) ("[t]he inference of 'unduly suggestive' proximity 'begins to dissipate where there is a gap of three months or more.'" (internal citations omitted)).

4

Even assuming Smith establishes a prima facie case, his retaliation claim fails at the second and third step of the burden-

---

[7] The District Court did not reach this issue but we may consider it as it was briefed in both that court and here and as the timing of these events is undisputed. *See Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 265 (3d Cir. 2014) ("We may affirm the District Court on any grounds supported by the record, even if the court did not rely on those grounds." (cleaned up)).

shifting inquiry. If Smith had established a prima facie case of retaliation, the burden would then shift to the City to advance a "legitimate, non-retaliatory reason" for its conduct. *Moore*, 461 F.3d at 342 (quotation omitted). If the City makes such a showing, the burden shifts back to Smith "to convince the fact-finder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (quotation omitted).

The City has offered a "legitimate, non-retaliatory reason" for calling Smith to respond to the tropical storm. *Id.* (quotation omitted). Specifically, the call volume for that emergency was so high that the City needed all firefighters to respond. The City argues that Smith's suspension after the fire emergency, then, was due to Smith's refusal of a direct order to respond to an emergency, rather than out of retaliation for his protected conduct. We conclude that these are legitimate, non-retaliatory reasons for the emergency response assignment and Smith's suspension.

At this stage in the burden-shifting inquiry, Smith's retaliation claim will survive if Smith demonstrates that the City's "stated reason[s]" for its conduct are a "pretext." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973). Smith argues that the City could not have a public safety interest or need in ordering him to respond to the tropical storm because the City did not ensure he had received adequate fire suppression training. Smith does not dispute, however, that "all firefighters including administrative and prevention personnel, [] including Plaintiff, were called in for emergency response purposes, including to put the reserve apparatus in service due to the overwhelming call volume caused by a tropical storm." J.A.

635–36. Nor does he meaningfully dispute[8] that there were "stacked 911 calls," "several structural collapse calls," that the Deputy Chief had to "suspend medical calls" due to lack of manpower, that the City "didn't have enough companies open to send a full response," and that it "really needed Engine-23 [(Smith's assigned engine)] to respond to several calls." J.A. 389–90. While Smith's lack of recent fire suppression training might call into question the wisdom of the City's decision to mobilize him, it does not create a genuine dispute that the City's stated need for all firefighters to respond "was false, and that retaliation was the real reason for the adverse employment action." *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)); *see also Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (to demonstrate pretext, "plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated by the employer, not whether the employer is wise, shrewd, prudent, or competent.").

---

[8] In his response to the Defendant's Statement of Undisputed Material Facts, Smith disputes the "accuracy of the content of the memo" detailing these facts. J.A. 638. Nonetheless, he does not specify how any fact cited above is inaccurate, and does not cite any source which sets forth contrary facts. *Id.*; *see* Fed. R. Civ. P. 56(e)(2) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the [summary judgment] motion."); Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record[.]").

Based on the foregoing, we will affirm the District Court's grant of summary judgment as to the retaliation claim.

D

Smith next asserts a claim under the Equal Protection Clause. Smith must point to an existing and relevant comparator. That is because the Clause "proscribes unequal treatment only among persons similarly situated according to a relevant standard of comparison." *Stradford v. Sec. Pa. Dept. of Corrections*, 53 F.4th 67, 74 (3d Cir. 2022). "Other factors explaining disparate treatment will usually preclude persons from being similarly situated." *Id.* As with the free-exercise inquiry, we identify comparators according to their impact on the City's asserted interest. *See DeHart v. Horn*, 390 F.3d 262, 272 (3d Cir. 2004).

Smith compares himself to two groups: off-duty firefighters and other Air Mask Technicians. As to the first, Smith says that "[they] are . . . allowed to wear beards . . . [and] respond to emergencies with their beards" while he is not. Appellant's Br. 61. That is inaccurate. The City's guidelines permit some marginal facial hair growth, so long as the hair does not interfere with the SCBA. The uncontroverted testimony of Chief Evans is that any firefighter who comes to work with anything more than a five o'clock shadow is not allowed to fight fires. When Smith is called in from being off-duty, the same applies to him. *See Williams v. Morton*, 343 F.3d 212, 222 (3d Cir. 2003) (determining there was no unequal treatment between Jewish and Muslim prisoners because both received vegetarian religious meals). These men's scruff do not implicate the City's safety interest; Smith's beard does, at least according to the policy. And although the City policy theoretically permits beards under the captains' discretion rule and Title VII, the

27

City has never granted an exemption for one. As to these comparators, Smith's claim fails.

Smith's comparison to the Air Mask Technicians of yesteryear also fails. His argument rests on the assertion that because previous Air Mask Technicians were never called to suppress fires, and he was, this violated his rights. But all those men, and Smith, were and are designated firefighters. Smith contracted to perform these tasks as part of his job. A citizen's right to equal protection is not violated just because his government-employer orders him to fulfill a valid and agreed-upon term of employment. For these reasons, we will affirm the grant of summary judgment as to Smith's Equal Protection Claim.

E

Finally, Smith asks us to reverse the denial of his motion for a preliminary injunction, which would "enjoin[]" the City "from taking any action adversely to affect . . . Smith's employment, title, status, responsibilities, privileges, compensation, I.D. Card, and/or benefits or other perquisites as an employee of the [City]" and to rescind his suspension. Dist. Ct. Dkt. No. 2-1, at 2. In other words, Smith asks to "enjoin[] the City from disciplining [him] for violating the [City's] Grooming Policy, effectively allowing him to wear a beard during the pendency of this matter." Appellee's Br. 42.

Because we review the denial of a preliminary injunction for abuse of discretion, we will affirm unless the "decision rests on an incorrect legal standard, a clearly erroneous factual finding, or a misapplication of the law to the facts." *Free Speech Coal.*, 974 F.3d at 430 (quoting *TD Bank N.A. v. Hill*, 928 F.3d 259, 270 (3d Cir. 2019)). To secure a preliminary injunction,

28

Smith must show "(1) a likelihood of success on the merits; (2) that [he] will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to [the City]; and (4) that the public interest favors such relief." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citing *Allegheny Energy, Inc. v. DQE Inc.*, 171 F.3d 153, 158 (3d Cir. 1999)). In a case involving a government defendant, the last two factors may be combined. *Roman Cath. Diocese*, 592 U.S. at 19–20.

Smith has a likelihood of success on the merits, because a plaintiff "need only prove a prima facie case." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 173 (3d Cir. 2001). Given the overlap between Smith's free-exercise and Title VII accommodation claims, the latter of which require a prima facie case, he meets the standard for relief. In rejecting these claims, the District Court abused its discretion in applying the incorrect legal standard to the free-exercise and accommodation claims. Its decision pre-dated both *Fulton* and *Groff*, which clarified the landscape for the Free Exercise Clause and Title VII, respectively. Without *Fulton*, the District Court failed to consider that the mere presence of an exemption regime rendered the law not generally applicable. And without *Groff*, the District Court considered Smith's accommodation claim under the outdated 'de minimis' standard of *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 92 (1997).

Smith prevails on the remaining factors. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese*, 592 U.S. at 19 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). And upon a "serious examination of the need" to compel Smith to violate his faith, we cannot

29

see a public interest of such weight as to deny the most fundamental of freedoms. *Id.* at 19–20.

\* \* \*

For these reasons, we will vacate the judgment of the District Court as to Smith's Free Exercise Clause and Title VII accommodation claims, affirm as to Smith's Equal Protection Clause and Title VII retaliation claims, and reverse as to the District Court's denial of the preliminary injunction.

**CHUNG**, *Circuit Judge*.

I respectfully dissent and would affirm the District Court as to Smith's Free Exercise claim.[1]

I.     DISCUSSION

Smith sought a religious accommodation to wear a beard while on duty. This implicated paragraphs 5 and 6 of the City's Operational Guideline entitled "Grooming Standards." J.A. 71. These set forth that:

> 5.     Members shall be clean shaven while on duty. Exception, those persons called in on an emergency call-back shall not be required to shave prior to arrival at the station or fire scene.
>
> 6.     Beards and goatees of any type are specifically prohibited. In no case shall facial hair, including stubble, inhibit the seal of the air mask's face piece. Facial hair of any type shall not interfere with the seal of SCBA face piece. No hair is permitted below the lower lip.

*Id.*

The exception set forth in paragraph 5 ("emergency exception") is the only enumerated exception in the Grooming

---

[1] Because I dissent in the Majority Opinion's conclusion that a genuine dispute exists regarding Smith's Free Exercise claim, I also dissent in the portion of the Majority Opinion addressing the preliminary injunction relating to that claim.

Standards. The Grooming Standards provide no exception to paragraph 6 which prohibits facial hair that inhibits the seal of the SCBA.

A. The Grooming Standards are Generally Applicable

"A law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by creating" a categorical exemption, or "a mechanism for individualized exemptions." *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 523 (2021); *Tenafly*, 309 F.3d at 166.

Smith proposes three individual exceptions to the grooming policy that he argues render it not generally applicable. The Majority Opinion concludes that the first individual exception asserted by Smith (the emergency exception) does not negate the general applicability of the Grooming Standards and I agree. Maj. Op. at 12–13.

Smith next asserts that the process for requesting an accommodation is an individual exception that undermines general applicability. The process Smith refers to is the employee complaint procedure, the mechanism by which the City employees may formally request accommodations. J.A. 196. The complaint procedure is not an enumerated exception to the Grooming Standards. As noted above, there is only one such exception and it does not undermine general applicability. Rather, the complaint procedure is a mechanism by which an employee can request an accommodation to *any* policy, including the Grooming Standards. As no facial hair accommodation to the Grooming Standards has ever been granted, it does not seem that the employee complaint

2

procedure provides for, or can be considered, an exception to that policy. *See*, *e.g.*, J.A. 195 (denying medical accommodation to Grooming Standards).

Even assuming that the complaint procedure is an exception, Smith identifies nothing other than the fact that the process exists to support his argument. We have noted, though, that employers' provision of a process by which employees can seek an accommodation is not *per se* the type of "mechanism for individualized exemptions," *Fulton*, 593 U.S. at 523, that undermines general applicability. *Spivack v. City of Philadelphia*, 109 F.4th 158, 172 n.8 (3d Cir. 2024) ("The mere provision of a religious exemption does not itself trigger strict scrutiny."). Here, *all* requests for accommodations to the Grooming Standards were denied and Smith offers nothing more to advance his argument. The City's "mere provision of a religious exemption [mechanism]," *id.*, is insufficient here to establish that the Grooming Standards fail to "treat[] similar religious and secular behavior similarly." *Spivack*, 109 F.4th at 176; *compare id.* at 172 (jury issue existed where employer "created, on paper" an apparently generally applicable mechanism for individualized exemptions, but where a jury could find that the employer "in practice … declined 'to extend [it] to cases of religious hardship.'" (alteration in *Spivack*, quoting *Fulton,* 593 U.S. at 535)).

The Majority Opinion concludes that the last individual exception asserted by Smith, that captains have discretion to allow firefighters to deviate from wearing the SCBAs, as well as an exception relating to the fit-testing policy that Smith did

not raise in his challenge to the Grooming Standard's general applicability,[2] undermines general applicability.

I disagree because the identified exceptions are not exceptions to the Grooming Standards policy, but rather are exceptions to two different policies: the City's Operational Guideline entitled "Respiratory Protective Program" and the City's policy that firefighters be fit-tested annually for their SCBA.

The first exception cited in the Majority Opinion is that "the City has long permitted administrative staff, all of whom are firefighters subject to the SCBA rule, to forgo fit testing." Maj. Op. at 13. The Grooming Standards do not require fit-testing, though. *See generally* J.A. 70-72. That requirement is set forth elsewhere.[3] More importantly, the exception in no way permits firefighters to have facial hair that interferes with the SCBA seal and thus is not an exception to the Grooming Standards.

The second exception cited in the Majority Opinion is that "the City's grooming regime has built-in discretion." Maj. Op. at 13. As the Majority Opinion implicitly acknowledges, however, that discretion is not to be found in the Grooming Standards but rather the "SCBA policy." *Id.*, *quoting* J.A. 73, Respiratory Protective Program. That separate and different Guideline provision allows Captains and incident commanders

---

[2] Smith discussed fit-testing requirements when arguing that the grooming policy was not neutral. Appellant's Br. at 50.

[3] It is unclear from the record whether there is a specific Operational Guideline that sets forth the frequency of testing, a PEOSH provision, or whether this is simply set forth as part of the Air Mask Technician's duties.

to determine *when and where* an SCBA is required to be worn.[4] As with the first exception, the exception does not permit firefighters to have facial hair that interferes with the SCBA seal and thus is not an exception to the Grooming Standards.

Because the exceptions cited by the Majority Opinion are not actually exceptions to the Grooming Standards,[5] but to two separate and different policies, they cannot be grounds for

---

[4] *See* J.A. 73 (requiring SCBA to be worn in hazardous atmospheres, atmospheres "suspected of being hazardous," atmospheres that "may rapidly become hazardous," "[w]hile working below ground level," and "[w]hile working in confined spaces"); *see* J.A. 74 (requiring SCBA to be worn in other dangerous situations, such as "active fire area[s]" and "where toxic products are present, suspected of being present, or could be rapidly release without warning") (emphasis in original).

[5] The Majority Opinion concludes these are Grooming Standards exceptions by implicitly folding these two separate policies into the Grooming Standards and referring to them collectively as the "grooming regime." Majority Op. at 12. There is no basis for this conflation. Smith did not ask for a religious accommodation to annual fit-testing nor to the Respiratory Protective Program. He simply seeks to wear a beard in accommodation of his religious beliefs, recognizes that it could implicate safety concerns, has no objection to wearing an SCBA, and has even fit-tested himself wearing an SCBA while bearded. *See*, *e.g.*, J.A. 173-74, 290, 409, 667; and Appellant's Br. at 38, J.A. 410 (noting that Smith would be willing to wear a quarter-inch-length beard to address the City's safety concerns).

concluding that the Grooming Standards are not generally applicable. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 542-46, (1993) (concluding that each of four ordinances dealing with animal killing was not generally applicable based on exceptions in each individual ordinance that targeted religious animal sacrifice); *Spivack*, 109 F.4th at 178 (noting that on remand the jury must first decide which policy was at issue and then determine whether that particular policy provided for discretionary, individualized exemptions); *Fulton*, 593 U.S. at 537 (ensuring that an exception to the challenged policy existed before finding that the exception rendered the policy not generally applicable).

### B.     Grooming Standards are Neutral

If a policy is not neutral, we will apply strict scrutiny review. *Id.* at 165. Smith does not argue that the Grooming Standards are not facially neutral. Rather, he asserts that the Grooming Standards are not neutral in application. *See Tenafly*, 309 F.3d at 165–66 (A facially neutral policy is nonetheless not neutral if "government officials exercise discretion in applying [it] . . . [and] exempt some secularly motivated conduct but not comparable religiously motivated conduct."). This argument is similar to his general applicability argument, but our focus here is whether the policy's application reflects "the purpose of[,] or motivation behind[,] a policy" and whether "policymakers' subjective intent" was to discriminate. *Spivack*, 109 F.4th at 167.

Smith contends that the Grooming Standards are enforced in a discriminatory manner because the City administrative employees (including Smith) were not fit-tested annually, in contravention of the City requirements, until after he put in a request for a religious exemption. Only at that time were all

6

administrative employees annually fit-tested. As explained above, however, fit-testing is a separate and different requirement from the Grooming Standards. In addition, it is uncontested that no employee, whether or not they were administrative and missed annual fit-testing, has been excused from complying with the Grooming Standards. It is further uncontested that *all* requests for accommodations to the Grooming Standards were denied. *See*, *e.g.*, J.A. 195 (denying medical accommodation to Grooming Standards). Given that the Grooming Standards are facially neutral and were applied equally to both religiously-motivated and secularly-motivated requests for accommodation, the lapses in fit-testing do not reflect a subjective intent by the City to discriminate and the policy is neutral.

### C.    Rational Basis Review Applies

As a generally applicable and neutral policy, the Grooming Standards are subject to rational basis review. A government policy survives rational basis review if the policy is "rationally related to a legitimate government" interest. *Tenafly*, 309 F.3d at 165 n.24; *Spivack*, 109 F.4th at 166 (noting that rational basis review is "a deferential standard" and is "easily satisfied").

The Grooming Standards are rationally related to a legitimate government interest. The government asserts a safety interest in optimizing SCBA efficacy. Although I disagree with the Majority Opinion that the exceptions to the Respiratory Protective Program and to the annual fit-testing requirement are exceptions to the Grooming Standards, I believe these exceptions are relevant in assessing the City's stated interest in optimizing SCBA-wearing safety and the tailoring to that interest. For instance, under strict (or possibly intermediate scrutiny), the exceptions might be sufficient to

undermine an asserted compelling interest in safety (e.g., because the City's lack of annual fit-testing may reflect that its interest in properly-sealed SCBAs is not as strong as they assert) or narrow tailoring (e.g., because a Captain may conclude that a firefighter could enter an active fire area without wearing an SCBA, it follows that a Captain could also allow a firefighter to enter that same area with an imperfectly-sealed SCBA). The exceptions are nonetheless insufficient to conclude that the City has not met its burden in asserting its interest in optimizing SCBA safety is legitimate, a much lower bar. *See Spivack*, 109 F.4th at 166 (stating that rational basis review is "a deferential standard" and is "easily satisfied," while strict scrutiny is "a far more exacting standard that demands" … "a *compelling* interest." (emphasis in original)); *see also* Maj. Op. at 16. The Grooming Standards are rationally related to optimizing SCBA safety in that a beard can inhibit the seal of an SCBA (which Smith does not dispute). J.A. 574-75; Appellant's Br. at 48-49. The Grooming Standards satisfy rational basis review and I would therefore affirm the District Court as to Smith's Free Exercise claim.

## II. CONCLUSION

For the foregoing reasons, I respectfully dissent from the Majority Opinion regarding Smith's Free Exercise claim.

8

**PORTER**, *Circuit Judge*, dissenting in part.

I respectfully dissent as to the denial of Smith's Title VII retaliation claim. On that issue, I agree with the majority that Smith alleged protected conduct and established an adverse action based on the 2020 tropical storm incident. We also agree that if Smith established a prima facie case, the City offers legitimate, non-retaliatory reasons for its actions.

I disagree with the majority's conclusion that Smith has not established a causal connection between his participation in protected activity and the adverse action. The majority denies causation because "more than eighteen months had elapsed since Smith's engagement in protected conduct and the tropical storm assignment." Maj. Op. 24. The immediate occasion for the fire suppression order was a tropical storm battering Atlantic City. I agree that "the temporal proximity is not 'unusually suggestive'" for that reason. *LeBoon v. Lancaster Jewish Cmty. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). If our analysis were limited to temporality and his initial request for accommodation, I would agree that Smith failed on causation.

But I question the majority's suggestion that the time period for proximity was eighteen months. As the majority acknowledges, prosecuting a lawsuit is also Title VII-protected conduct. Maj. Op. 21. The lawsuit was in full swing at the time of the fire suppression order and suspension, so the City's adverse action was contemporaneous with Smith's protected conduct.

In any event, temporal proximity is merely an analytical tool, not the test itself. "We consider 'a broad array of evidence' in determining whether a sufficient causal link exists."

*LeBoon*, 503 F.3d at 232 (quoting *Farrell*, 206 F.3d at 284). When temporal proximity fails, a plaintiff may prevail on "the proffered evidence, looked at as a whole." *Id.* (quoting *Farrell*, 206 F.3d at 280). He can establish "intervening antagonism or retaliatory animus, inconsistencies in the employer's articulated reasons for [the adverse action], or any other evidence in the record sufficient to support the inference of retaliatory animus." *Id.*

This case features a train of alleged abuses centering on Smith's religious exercise, including orders to shave while his request was pending. But the 2020 fire suppression order is particularly salient, given that it departs from the whole of the City's pre-litigation conduct.

Before the 2020 fire incident, the City barred Smith from fire suppression altogether. It had several layers of protocol in place to prevent him from participating. And *no* Air Mask Technician had been called to engage in fire suppression for at least thirty-five years. The City is no stranger to natural disaster, including weather emergencies. It issues emergency callbacks once or twice per year. Tropical Storm Isaias was not even the first tropical storm to strike Atlantic City *that year*: Tropical Storm Fay struck three months earlier; and Tropical Storms Irene, Bertha, and Danielle hit the City in 2011, 1996, and 1992, respectively. But in none of these previous emergencies did the City call on Air Mask Technicians to engage in fire suppression.

That changed when Smith requested a religious accommodation. During Tropical Storm Isaias, the City went straight to Smith, whom City policy barred from fire suppression, even when the City had not called for mutual aid or activated its other protocols, even though another firefighter could have

taken his place (and did so), and even though there was no fire. The City called in the one man suing them over religious accommodations that impacted the City's response, not to downed power lines, not to medical evacuation, but to fire suppression. These unexplained breaches of longstanding protocol, in the middle of a lawsuit, are actions "that . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). In my view, Smith has made out a prima facie case.

The majority fares no better on pretext. An employee shows pretext if he "[is] able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (quoting *Krouse*, 126 F.3d at 500–01). When we say an explanation is "false" and not the "real reason," we do not mean the proffered reason was imaginary. Instead, a reasonable factfinder could conclude "that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).

The majority puts heavy stock in the nature of the tropical storm emergency. There were 911 calls, structural calls, manpower shortages, and that the City "really needed" Smith to respond. Maj. Op. 26 (quoting J.A. 389). But this downplays Smith's arguments about the City's bizarre behavior.

The omission from the majority's account is a *fire*, and Smith was ordered to suppress a fire—the one activity requiring an air mask, thus implicating AFCD's facial-hair policy. The City ordered Smith to engage in the particular activity for which he lacked necessary training, endangering him and

3

others. That this was "[un]wise" is not at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). The issue is pretext. That makes the City's conscience-suppressing (and dangerous) order all the more disconcerting, in light of its admission that there was no fire. An employer's changing explanation of the factual record at different stages of litigation may also be evidence of pretext. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 283–84 (3d Cir. 2001). But that is a matter for the factfinder to consider.

From Smith's perspective, believing the alleged conflagration to be real, his action would have been a lose-lose-lose-lose scenario. If he responded, he would endanger himself and his comrades, or have to shave and violate his conscience when the situation did not require it, or refuse to shave and risk reprimand. If he did not respond, he again faced reprimand. For the City, the order was a win, no matter what. The litigious employee had to respond to the scene: if clean-shaven, the City achieved compliance; if bearded, he could be disciplined consistent with the policy; and if insubordinate, he could be disciplined for a banal reason. The overall context, and the odd series of events in light of the City's admission that there was no fire, raises a genuine question of material fact about pretext.

It is rare that a party's change of position mid-litigation *alone* will establish pretext, but that is not all. "[E]vidence supporting the prima facie case is often helpful in the pretext stage," and that is true here. *LeBoon*, 503 F.3d at 234 n.10 (quoting *Farrell*, 206 F.3d at 286)). When the City has decades of consistent behavior for emergency response (not calling Air Mask Technicians to suppress fires), and contradicts that policy mid-litigation, that, too, can be evidence of pretext.

As I see it, the record includes some facts potentially favoring the City's explanation and some facts supporting Smith's version of events. But it is not our job to choose between them. "[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). So long as there is "evidence on which the jury could reasonably find for the plaintiff," we are duty-bound to remand. *Id.* (quoting *Anderson*, 477 U.S. at 253). The majority emphasizes the facts favorable to the City and ignores those favorable to Smith. Taking both sets of facts into account, I do not see how it is possible to conclude that no reasonable trier of fact could find pretext.